**UNITED STATES of America, Plaintiff,**

**v.**

**Lamont ARRINGTON, Defendant.**

**No. 90 CR 1008.**

United States District Court,
N.D. Illinois, E.D.

May 29, 1991.

Philip Guertert, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Luis M. Galvan, Federal Defender Program, Chicago, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

### MEMORANDUM OPINION AND ORDER

This Court ordinarily deals with its sentencing decisions—whether imposed under

the Sentencing Guidelines ("Guidelines") or for pre-Guidelines offenses—orally during the course of its sentencing proceedings. That less formalized treatment usually seems appropriate given the fact that, for the most part, judicial determinations as to the applicable Guideline or as to any appropriate adjustments do not involve principles of broad application such as to call for written opinions, let alone publication. This opinion, however, is triggered by a recurring issue that continues to be posed by the government in a substantial number of offenses prosecuted in this District: those involving thefts from the United States mails by employees of the United States Postal Service.

One flaw that certainly cannot be ascribed to the United States Attorney's office in such mail theft prosecutions against postal employees is that of inconsistency. All the judges in this District continue to get arguments for a two-level increase in the Guideline calculations for "abuse of trust," even though this Court and its colleagues have regularly continued to reject that position. It is the unanimous view of all participants in the Sentencing Council in this District[1] that the United States Attorney's position urging such an across-the-board increase distorts the meaning of the "abuse of trust" concept.[2] If the prosecutors feel so keenly on the issue, the thing for them to do is to appeal an adverse ruling. If our Court of Appeals then wishes to give its imprimatur to what has generally been perceived at the District Court level as a distortion of the relevant statute and Guidelines, in the best tradi-

tions of judicial responsibility the District Judges will certainly subside from their position—however universally it may have been shared.

■ But rather than simply expressing such a reaction in conclusory terms, this opinion is being issued in the hope—perhaps forlorn—that the prosecutorial branch is educable on the subject. For this purpose it will be assumed arguendo that work in the postal system is instinct with the "public trust"—though it might be suggested that in the sense of that term as it is sought to be used by the government, virtually *every* governmental employee is vested with the "public trust" to a greater or lesser degree. Whether people are occupied as postal employees or at any other level of the executive branch (including work as prosecutors[3]), the common employer is the disembodied entity known as the United States; and conceptually the duties of all government employees might be said to run to all the members of the public, who collectively make up that disembodied entity. But in any case the portion of the government's memorandum in the current case that argues in favor of the "public trust" concept for postal employees will be viewed as accepted for the sake of argument for current purposes.

As always, it is best to begin by looking at the relevant language itself. Here is Guideline § 3B1.3:

**Abuse of Position of Trust or Use of Special Skill**

If the defendant abused a position of public or private trust, or used a special

---

1. About a dozen of the active judges who receive criminal case assignments in this District Court participate in a voluntary group that meets weekly to discuss sentencing recommendations, after having reviewed the presentence investigation reports covering all defendants who are scheduled to be sentenced by any of the participating Sentencing Council members during the following week. In addition to exchanging views on those particular upcoming cases, members of the Sentencing Council also frequently discuss matters of general or recurring applicability in the sentencing process—and that has included several in-depth discussions of the issues dealt with in this opinion.

2. That view is also shared by the probation officers in this District, all of whom have received training course in the Guidelines and their application. Thus the Guidelines calculation by experienced Probation Officer Sandra Mentus in the presentence investigation report that she has prepared in this case does not include an "abuse of trust" increase in level.

3. Judges might have been listed at this point too, but this Court recalls some mixed case law on whether Article III status connotes a relationship other than employer-employee as between the United States and those appointed to an essentially lifetime judicial office by the President with the advice and consent of the Senate.

skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed in addition to that provided for in § 3B1.1, nor may it be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.[4]

And because the Commentary to that section is brief, it too will be quoted in full:

*Application Notes:*

1. The position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons. This adjustment, for example, would not apply to an embezzlement by an ordinary bank teller.

2. "Special skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts.

*Background:* This adjustment applies to persons who abuse their positions of trust or their special skills to facilitate significantly the commission or concealment of a crime. Such persons generally are viewed as more culpable.

■ In this wholly typical case defendant Lamont Arrington ("Arrington") was a "casual mailhandler"—someone charged with various tasks involving the sorting, processing and stamping of mail—who embezzled $14 in United States coins from a first-class package addressed to Rare Coins, Inc.[5] As his job title suggests, Arrington was not vested with any special level of responsibility—quite the contrary, his access to mail that might contain things of value was no different from that of thousands of postal workers.[6] And he was charged with and pleaded guilty to an offense that by congressional definition could be committed *only* by a postal employee— 18 U.S.C. § 1709 ("Section 1709")—and that, in Congress' language, covers property "entrusted to him or which comes into his possession."

One other factor should be added to the mix: Of course the Sentencing Commission was well aware that there are *two* criminal mail theft statutes placed cheek by jowl in the Criminal Code—both Section 1709, under which Arrington was charged, and its immediate neighbor 18 U.S.C. § 1708, which criminalizes among other things the selfsame theft by *any* person (whether or not a postal employee) of matter that has been placed into the postal stream between mailing and delivery. And knowing that, the Sentencing Commission deliberately chose to establish the *identical* Guideline § 2B1.1 as applicable to *both* those offenses. Finally, having done that, the Sen-

---

**4.** [Footnote by this Court] What is quoted in the text reflects the Guideline language that has been effective from the beginning (November 1, 1987) through October 31, 1990. As to crimes committed from and after November 1, 1990, the provision has been changed to read this way:

**Abuse of Position of Trust or Use of Special Skill**

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addi-

tion to an adjustment under § 3B1.1 (Aggravating Role).

No change has been made in the Commentary from what is quoted next in the text of this opinion.

**5.** As most frequently happens in these cases, that was a test parcel designed to suggest the likelihood that it contained some contents of value—a parcel that without any hint of entrapment would likely be attractive to the criminally-minded postal employee.

**6.** "Things of value" in the mail theft cases is not limited to such items as coins and currency, which are inherently negotiable. Indeed, most mail theft cases in this District involve the theft of checks, which require forged endorsements— the commission of still another crime—to be reduced to cash. Yet there is a regular and established market for the sale of those stolen checks at about one-third of their face value.

tencing Commission included in that Guideline two special provisions relevant to mail theft—without making any distinction in terms of which of those two mail theft statutes covered by the Guideline was involved:

1. After establishing a Base Offense Level of 4 for such mail thefts and for other crimes coming within the generic categories of "Larceny, Embezzlement, and Other Forms of Theft," Guideline § 2B1.1(b)(4) prescribed this in the category of Specific Offense Characteristics:

If undelivered United States mail was taken, and the offense level as determined above is less than level 6, increase to level 6.

2. As part of the "Background" explanation in the Commentary to the Guideline Section, the Sentencing Commission said:

Consistent with statutory distinctions, an increased minimum offense level is provided for the theft of undelivered mail. Theft of undelivered mail interferes with a governmental function, and the scope of the theft may be difficult to ascertain.

■ In the face of all that, it is difficult to perceive any basis on which the government can urge that there is anything to support the notion that the low-level postal employee who is given no *special* position of trust should be subjected to anything other than the straightforward application of Guideline § 2B1.1, without a two-level increase under Guideline § 3B1.3.[7] Its argument that *every* postal job is "imbued with the public trust" (citing and quoting from *United States Postal Service v. American Postal Workers Union, AFL–CIO*, 736 F.2d 822, 825 (1st Cir.1984), spoken in another context) actually cuts *against* the government's position. That decision, *id.* accurately observes that "[a]ny postal position which handles mail is one entrusted with items of importance and value by the public." But despite the general validity of that notion, the Sentencing Commission chose to place the charged postal-worker offense under Section 1709 (a statute that uses the same concept and language of "entrustment") under the identical generic Guideline § 2B1.1 that applies to mail thefts by all other persons, with no suggestion of an *automatic* increase for all postal workers. It is impossible to conclude that the Sentencing Commission equated all Postal Service employment with the "public trust" within the meaning of Guideline § 3B1.3.

That being so, and lacking support either in the Guidelines themselves or in logic, the United States seeks to point to two decisions, one in the Ninth Circuit and one in the Eighth Circuit.[8] Neither of those decisions carries persuasiveness when it is sought to be applied—as the government would have it—to extend sentence enhancement to every low-level postal employee carrying out garden-variety responsibilities, such as Arrington.

*United States v. Hill*, 915 F.2d 502, 505–06 (9th Cir.1990) sought to synthesize the existing case law and to distill from it one

---

7. As it turns out, Arrington's theft was of such small magnitude that there is no increase under the "Special Offense Characteristics" part of Guideline § 2B1.1(b)(1) (because no such increase is applicable to any theft of $100 or less). Thus the Special Offense Characteristic quoted in the preceding paragraph of the text did come into play to bring the Base Offense Level of 4 up to 6. But because of Arrington's clear acceptance of responsibility, the ultimate Offense Level Total went back down to 4. And with no prior convictions, Arrington's Criminal History of I under the Guidelines interacted with that level to produce the lowest possible sentencing range of 0 to 6 months. As it turns out, if the government were to prevail in its position in this case, the sentencing range would be no higher, so it makes no difference here. But a change in one or more factors in another case could mean the difference (for example) between *no* mandated time in custody or *some* time in custody—for a two-level increase is usually meaningful.

8. At the risk of being burned at the stake for heresy, this Court is sometimes struck by the parallel between (1) the regular (and time-honored) lawyer's practice, when both common sense and the applicable regulatory or statutory or even constitutional language points the other way, of calling on precedent (often precedent that has to be rough-hewn to a quite different shape to do the job) and (2) Samuel Johnson's satirical characterization of patriotism:

Patriotism is the last refuge of a scoundrel.

principle and two indicia that set the "position of trust" apart from other situations. As for the principle, *Hill, id.* said that "the primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." And as for the suggested indicia, *Hill, id.* (footnotes omitted) said this:

> One indicium of such freedom to commit a difficult-to-detect wrong under section 3B1.3 is the inability of the trustor objectively and expediently to determine the trustee's honesty. A criminal act which cannot be discovered as a matter of routine is such a "difficult-to-detect" wrong. In contrast, the daily audit of an ordinary bank teller's till is an "objective and expedient" means of discovering criminal activity, which supports the conclusion that a teller is not typically in a position of trust.

> A second indicium of freedom to commit a difficult-to-detect wrong is the ease with which the trustee's activities can be observed. This indicium implicates a defendant's ability to make an undetected post-crime flight. If one has placed a defendant in a position to commit a crime and leave the area before the crime will be discovered, the defendant will generally be in a position of trust.

With all respect, that discussion does not add too much to the analysis. This Court has encountered a substantial number of cases—both its own and those coming before the Sentencing Council from time to time—in which ordinary bank tellers have engaged in long undetected and quite sophisticated embezzlements just by taking advantage of their access to money, something that is inherent in the job. In those situations the daily audit of the till was not in fact the " 'objective and expedient' means of discovering criminal activity." And as for *Hill*'s stated "second indicium," the ease of observation of an employee's conduct is of course a matter of definition

and of how many resources the employer commits or is able to commit to such activity.[9] In terms of the "ability to make an undetected post-crime flight," few if any bank tellers are caught on the scene in the very act of embezzlement, unless by sheer chance or by singular stupidity (such as a teller's stuffing bills from the cash drawer into his or her pockets out in the open).

What this Court views as important about the Sentencing Commission's choice of the "ordinary bank teller" as its one specific example of someone who is *not* subject to the two-level enhancement for abuse of trust is the recognition that the job is at a quite low level and is not a highly-skilled occupation, even though *by its very nature* it provides the employee with extraordinary opportunities for criminal activity because he or she deals on a regular and continuing basis with a commodity (money) that is especially susceptible to such activity. That quality is equally true of the ordinary postal employee.

*United States v. Lange*, 918 F.2d 707 (8th Cir.1990) dealt with a postal employee who was charged (like Arrington) under Section 1709 with stealing money from the mail. In a 2–to–1 decision the court held that the employee's specific functions in handling express and certified mail—something that gave him the special opportunity that he seized upon to commit his thefts—came within the "abuse of public trust" category (*id.* at 710):

> Postal employees in general did not have the same opportunity as Lange to steal from this type of mail and conceal the crime, and the kinds of mail involved are especially sensitive and probably more likely to contain things of value than mail in general.

There is in this Court's opinion a good deal of force to the dissent by Senior Circuit Judge Heaney (*id.* at 712), but it is unnecessary to prefer that position over the majority's to find *Lange* inapplicable here.

---

**9.** No bank is in a position to employ its resources to replicate, for example, the surveillance measures that are used by gaming casinos to watch their employees who deal with large amounts of currency—the one-way mirrored ceilings from which observation may take place, or closed-circuit TV screens subject to constant monitoring, or any other sophisticated and expensive means requiring both equipment and manpower.

What has just been quoted shows that the majority's rationale would *not* subject Arrington to the two-level enhancement, and again the United States' cited authority cuts against it rather than in its favor.[10]

### Conclusion

It is time that the United States Attorney's Office either should pursue its "abuse of trust" argument as to the ordinary postal employee by appealing an adverse ruling on that score or, if not, should abandon that position.[11]   Because nothing has been written on the subject before this, Assistant United States Attorneys continue to assert it—and maybe there are those among the District Judges here who are persuaded by it.[12]

This case happens to come out the same way whether the government is right or wrong in its position.   That being so, this Court's rejection of the United States' motion creates a condition of mootness that would foreclose appealability in this case. But once again this Court urges that considerations of responsibility compel the government to abandon its efforts unless it is prepared to stand behind them in a meaningful way at the earliest opportunity.

---

10.   To show just how result-oriented the United States' position really is, the government's Mem. 9 n. 2—having called this Court's attention to *Lange* in the first place—then proceeds to disavow that decision's reliance on what it admits was "his unique access to *express and certified* mail, which is often more valuable than regular mail" (emphasis in the Memorandum).   That kind of selective citation—take the portion of cited authority that you like and ignore the part that you don't—is all of a piece with the government's argument, not previously mentioned here, that if the Commentary to Guideline § 3B1.1 does not support the government's position it "is inconsistent with the actual language of the Guideline" and therefore "should be disregarded."

11.   When the Internal Revenue Service chooses not to follow an established pattern of judicial decisions, it announces its "nonacquiescence" in those decisions.   Whatever may be thought of such a practice as a matter of the proper role of people in the executive branch (it will be recalled that a few years back the Social Security Administration was subjected to a great deal of criticism for its continued disregard of the strong current in judicial decisions disapproving the administrative decisions as to "disability"), at least it has the virtues of candor and full disclosure.

12.   As n. 1 reflects, not all of the judges in this District are participants in the purely voluntary Sentencing Council.   Accordingly there is no way of knowing whether nonparticipating judges do or do not share the views expressed here (though it may be noted that the government's current Memorandum cites to no rulings in this District Court as having accepted the arguments it advances, that could be accounted for simply by the absence of written as contrasted with oral rulings).   If that is indeed the case, the whole purpose of consistency in sentencing that is sought to be served by the Guidelines is subverted by the prosecutors' persistence in the hope of getting a sympathetic ear or ears.