**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William A. OPLINGER, Defendant–
Appellant.**

No. 97–30110.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 1998.

Decided July 14, 1998.

Barnett N. Kalikow (argued), Olympia, Washington, for the defendant-appellant.

Leonie G.H. Grant, Assistant U.S. Atty. (argued), Katrina C. Pflaumer, United States Attorney, Seattle, Washington, for the plaintiff-appellee.

Before: BROWNING and O'SCANNLAIN, Circuit Judges, and ALFREDO MARQUEZ,* Senior District Judge.

O'SCANNLAIN, Circuit Judge:

Among other issues presented to us by this appeal from conviction and sentence for bank fraud, we are asked to re-examine whether the privilege against self-incrimination extends to out-of-court pre-arrest statements made to private individuals.

I

Oplinger was employed as supply coordinator for the Heritage Bank ("Heritage") in Olympia, Washington, from March 1988 through May 1995. He was responsible for

* The Honorable Alfredo Marquez, Senior United States District Judge for the District of Arizona, sitting by designation.

the purchase and distribution of supplies for Heritage's main office in Olympia, as well as its six branch offices. Oplinger purchased supplies from a number of different vendors, including Price/Costco ("Costco"), a membership-based warehouse business with numerous stores in western Washington. Most of the vendors from whom Heritage purchased supplies were credit vendors who billed Heritage directly. Costco was Heritage's only cash vendor. Heritage had special accounting requirements for cash purchases, and all cash purchases Oplinger made required prior approval. Oplinger was the only Heritage employee who made purchases from Costco.

From approximately May 1, 1993, to May 18, 1995, Oplinger engaged in a pattern of purchasing unnecessary office supplies from Costco and returning those supplies for cash refunds. Oplinger would then keep the cash refunds for his own purposes. Over the two years, Oplinger kept a total of $22,700.05 in refunds.

On May 17, 1995, Heritage became aware of Oplinger's activities when Anna Holland, a Costco employee, contacted Wendy Gauksheim, Oplinger's supervisor and Heritage's vice-president of corporate services, to inquire whether there was a problem with Costco's merchandise in light of the volume of Heritage's returns. Upon request, Holland provided Gauksheim with documentation demonstrating that Heritage had been returning thousands of dollars worth of merchandise.

On May 18, 1995, Gauksheim, along with John Pearry, another Heritage officer, met with Oplinger to question him about the Costco returns. When Gauksheim confronted Oplinger with what she had learned from Costco, Oplinger explained that he had occasionally received and returned defective merchandise to Costco. Gauksheim responded that the Costco records showed returns totalling several thousand dollars, far more than an "occasional" return, and asked him what he had done with the money. At this point, Oplinger leaned back in his chair, placed his hands over his eyes and said he did not know. He did not elaborate further when Gauksheim told him that he would be fired if he was unable to account for the money or

when Pearry informed him that Heritage's regulators and the Federal Bureau of Investigation ("FBI") would have to be notified. Oplinger just repeated that he did not know. Gauksheim then fired Oplinger.

Costco refund logs documented 76 separate return transactions between May 1, 1993 and May 18, 1995, involving hundreds of separate items. The average size of the cash refund was approximately $300. Out of the hundreds of items returned, Costco identified only two or three that were damaged or defective. Costco salvage logs and computer inventory records demonstrated that, during the relevant time, it did not experience any quality problems with the items Oplinger had been returning on a regular basis.

A federal grand jury in the Western District of Washington returned an indictment against Oplinger charging him with twenty-one counts of bank fraud in violation of 18 U.S.C. § 1344, each representing a separate return transaction. Oplinger's first trial was before Judge Franklin D. Burgess. Oplinger testified that he used the refunds to purchase replacement merchandise from Heritage's other vendors, primarily Office Depot. Oplinger offered no documents or witnesses to corroborate his testimony. Nonetheless, the jury was unable to reach a verdict and Judge Burgess declared a mistrial.

The matter was reassigned to Senior Judge Jack E. Tanner for a second trial. Oplinger did not testify at this trial. The government presented evidence demonstrating that it would have been unnecessary for Oplinger to use cash to purchase replacement goods at any of Heritage's other vendors, including Office Depot, because those vendors sold goods to Heritage on credit. The jury convicted Oplinger of all twenty-one counts and Judge Tanner sentenced him to twenty-one months imprisonment, to be followed by a four-year term of supervised release. Judge Tanner applied a two-point sentence enhancement for abuse of a position of trust and another two-point enhancement for obstruction of justice. Oplinger was immediately remanded into custody.

Oplinger timely appealed.

## II

Oplinger first claims that the evidence was insufficient to support his conviction for bank fraud pursuant to 18 U.S.C § 1344.[1] Specifically, Oplinger maintains that the government failed to present any evidence demonstrating that he converted bank funds to his own use.

■ In order to establish a violation of 18 U.S.C. § 1344, the government must prove beyond a reasonable doubt that Oplinger knowingly (1) engaged in a scheme[2] to defraud a federally chartered or insured financial institution, or (2) participated in a scheme to obtain money under custody or control of a federally chartered or insured financial institution by means of material false statements or representations. *See* 18 U.S.C. § 1344; *United States v. Nash*, 115 F.3d 1431, 1436 (9th Cir.1997); *United States v. Cloud*, 872 F.2d 846, 850 (9th Cir.1989). The government need not prove that a defendant actually profited from his crime or that a bank suffered an actual loss. *See United States v. Mason*, 902 F.2d 1434, 1442 (9th Cir.1990) ("[W]e conclude a federally supported financial institution need not incur a 'loss' in order to be a victim of 'false or fraudulent pretenses, representations, or promises.'"); *see also United States v. Moede*, 48 F.3d 238, 242 (7th Cir.1995) (holding that personal benefit to defendant not required to support conviction under bank fraud statute; sufficient that defendant intended to cause actual or potential loss to financial institution).

Were we to adopt the interpretation urged by Oplinger, 18 U.S.C. § 1344 would only permit punishment of the "loss" rather than the conduct that led to or could lead to a loss. Such a narrow construction was not intended by the statute. *See Mason*, 902 F.2d at 1442. The government need only prove that Oplinger engaged in the conduct prohibited by 18 U.S.C. § 1344 with the requisite intent.

■ The evidence presented at trial demonstrated that, between May 1993 and May 1995, Oplinger knowingly engaged in a pattern of purchasing items that Heritage did not need and returning those items to the one vendor that would give him a cash refund. Oplinger engaged in seventy-six separate return transactions at Costco, returning hundreds of items he had previously purchased for Heritage. Oplinger received a cash refund of about $300 per transaction, aggregating a total of $22,700.05 over two years. With two or three exceptions, the merchandise Oplinger returned was in good, resalable condition. Moreover, Costco had no quality problems with the brands of items that Oplinger most regularly returned. There was no evidence that Oplinger returned any of the money to Heritage or purchased any replacement merchandise.

Viewing the evidence in the light most favorable to the prosecution, a rational jury could surely have found that Oplinger knowingly engaged in a scheme to defraud Heritage. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

## III

■ Oplinger next argues that the government violated his privilege against self-incrimination and his right to due process by eliciting testimony regarding the May 18, 1995 meeting[3] with Gauksheim and Pearry

---

1. Whoever knowingly executes, or attempts to execute, a scheme or artifice—

    (1) to defraud a financial institution; or

    (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

    shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both. 18 U.S.C. § 1344.

2. The term "scheme" is defined to include "any plan, pattern or cause of action, including false and fraudulent pretenses and misrepresentations, intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived." *United States v. Cloud*, 872 F.2d 846, 850 (9th Cir.1989) (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3rd Cir.1987)).

3. Oplinger challenges the following exchange between Gauksheim and the government attorney regarding the May 18th meeting:

    Q: Did he offer you an explanation?
    A: At first he said once in a while I get a defective item and take it back to Costco.

and by commenting on that testimony during closing argument.[4] Oplinger claims he gave a partial answer to Gauksheim's inquiry regarding the refunded monies, but as soon as he became aware that the meeting was a "pretermination hearing" and that his answers would be reported to the FBI, he chose to remain silent. Oplinger claims that the government's reference to his "silence" was constitutional error because "non-custodial, pre-arrest, and investigatory assertions" of the right to remain silent are protected by the Fifth Amendment privilege against self-incrimination and the right to due process.

Although the Supreme Court has held that the government may comment on a defendant's pre-arrest silence for impeachment purposes, see Jenkins v. Anderson, 447 U.S. 231, 239, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), it has yet to rule on the constitutionality of the use of pre-arrest, pre-Miranda silence as substantive evidence of guilt. See id. at 236 n. 2, 100 S.Ct. 2124 ("Our decision today does not consider whether or under what circumstances pre-arrest silence may be protected by the Fifth Amendment."). Despite the reservation of this issue in Jenkins, however, we are not completely without guidance from the Court. In his concurrence in Jenkins, Justice Stevens wrote that he would have rejected the defendant's Fifth Amendment claim simply because the privilege against compulsory self-incrimination is irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak. See Jenkins, 447 U.S. at 241, 100 S.Ct. 2124 (Stevens, J., concurring). According to Justice Stevens,

> The fact that a citizen has a constitutional right to remain silent when he is questioned has no bearing on the probative significance of his silence before he has any contact with the police. ... When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment. For in determining whether the privilege is applicable, the question is whether petitioner was in a position to have his testimony compelled and then asserted his privilege, not simply whether he was silent. A different view ignores the clear words of the Fifth Amendment.

Id. at 241, 243–44, 100 S.Ct. 2124 (Stevens, J., concurring) (footnotes omitted) (emphasis added).

We agree. Contrary to our assertions in United States v. Thompson, 82 F.3d 849, 855 (9th Cir.1996), and in United States v. Calise, 996 F.2d 1019, 1022 (9th Cir.1993), we have previously addressed the constitutionality of the use of pre-arrest, pre-Miranda silence as substantive evidence of guilt. In United

Q: What was your response?
A: I said Bill we're talking about far more than a few defective items, we're talking about thousands of dollars worth of defective items and I need to know where the money is.
Q: Did he explain where the money is?
A: No.
Q: Did you explain to him that if he didn't explain or offered you an explanation for where the money was that he would be fired?
A: Yes, I did.
Q: Did he give you an explanation?
A: At one point he leaned back in his chair and kind of covered his eyes like that and said he didn't know.
Q: Was he advised that the bank would have to report his conduct to the FBI and to the bank's regulators?
A: Yes, he was.
Q: And still he offered no explanation to you?
A: Correct.
Q: Did he at any time request an opportunity to put together a response to you?
A: No.

Q: Did he ever suggest that you talk to certain people about where the money was?
A: No.
Q: Nothing other than "I don't know"?
A: Right.

4. In its closing argument, the government attorney commented on the May 18th meeting as follows:

"It was explained to him, it would have to be reported to the FBI and the bank's regulators. Did he give a response or an explanation? No.
Did he ask for time to put together a response? No.
Did he rant and rave and scream about being charged unjustly with stealing? No.
Did he ask them to contact people at Costco about defective merchandise that he was supposedly returning? No.
Did he call Costco and scream about them lying to the bank about merchandise he was returning? No.
Does this sound like the conduct of an innocent person? Of course it doesn't."

*States v. Giese,* 597 F.2d 1170 (9th Cir.1979), in response to the defendant's argument that the use of his pre-arrest silence violated his privilege against self-incrimination, we held that "[n]either due process, fundamental fairness, nor any more explicit right contained in the Constitution is violated by the admission of the silence of a person, not in custody or under indictment, in the face of accusations of criminal behavior." *Id.* at 1197.

Applying our existing precedent, therefore, we must hold that the admission of testimony regarding the May 18th meeting did not offend Oplinger's privilege against self-incrimination under the Fifth Amendment or his right to due process under the Fourteenth Amendment.[5] We are joined in this conclusion by the Fifth and Eleventh Circuits although three other circuits have held to the contrary. *See United States v. Zanabria,* 74 F.3d 590, 593 (5th Cir.1996) (holding that, although the Fifth Amendment protects against compelled self-incrimination, it "does not ... preclude the proper evidentiary use and prosecutorial comment about *every* communication or *lack* thereof by the defendant which may give rise to an incriminating inference."); *United States v. Rivera,* 944 F.2d 1563, 1568 (11th Cir.1991) ("The government may comment on a defendant's silence if it occurred prior to the time that he is arrested and given his *Miranda* warnings." (citing *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980))).

In so holding, we respectfully disagree with the First, Seventh, and Tenth Circuits, which have all held that pre-arrest silence comes within the proscription against commenting on a defendant's privilege against self-incrimination laid down in *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). *See United States v. Burson,* 952 F.2d 1196, 1200–01 (10th Cir. 1991); *Coppola v. Powell,* 878 F.2d 1562, 1565–68 (1st Cir.1989); *United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1018 (7th Cir.1987).[6] In our view, the position those courts have endorsed is simply contrary to the unambiguous text of the Fifth Amendment, which plainly states that "[n]o person ... shall be *compelled* in any criminal case to be a witness against himself." U.S. Const. amend. V (emphasis added). The Supreme Court has "never on any ground ... applied the Fifth Amendment to prevent the otherwise proper acquisition or use of evidence which ... did not involve compelled testimonial self-incrimination of some sort." *Fisher v. United States,* 425 U.S. 391, 399, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

Prior to custody or indictment here, the government made no effort to compel Oplinger to speak; he was free to act as he pleased. *See Giese,* 597 F.2d at 1196–97. Consequently, the constitutional privilege against compelled self-incrimination simply did not come into play. The self-incrimination clause was intended as a "limitation on the investigative techniques of government, not as an individual right against the world." *United States v. Gecas,* 120 F.3d 1419, 1456 (11th Cir.1997). We have no mandate to hold otherwise.

---

**5.** Like the defendant in *Giese,* Oplinger cites to *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), in support of his claim that the use of pre-arrest silence violates his privilege against self-incrimination and his right to due process. Oplinger's reliance upon *Doyle* is misplaced. *Doyle* concerned the admissibility of a defendant's silence at the time of arrest and after he had received a *Miranda* warning. *See Doyle,* 426 U.S. at 617, 96 S.Ct. 2240. As noted by the Supreme Court in *Jenkins,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86, in that situation, the government has informed a person that he has the right to remain silent and has assured him, at least implicitly, that his subsequent decision to remain silent cannot be used against him. *See id.* at 239–40, 100 S.Ct. 2124. Such is not the case, however, in the pre-arrest, pre-*Miranda* context. There is no governmental inducement to remain silent and no promise that an individual's silence will not be used against him; therefore, the "fundamental unfairness" present in *Doyle* is notably absent prior to custody. Hence, *Doyle* does not help Oplinger. *See, e.g., Jenkins,* 447 U.S. at 240, 100 S.Ct. 2124.

**6.** Notably, perhaps, in all these cases, the party seeking to assert the privilege against self-incrimination was questioned by a government official. *See Burson,* 952 F.2d at 1199 (questioned by Internal Revenue Service criminal investigators); *Coppola,* 878 F.2d at 1564 (questioned by New Hampshire state trooper); *Lane,* 832 F.2d at 1015 (questioned by police officers). Such was not the case here. There was no government involvement in the meeting between Oplinger and his employers; it was strictly a matter of private concern between private individuals.

## IV

Oplinger next argues that jury instruction #9 essentially directed the jury to find a guilty verdict in violation of the Sixth Amendment. The instruction reads, in relevant part:

> The defendant is charged with ... bank fraud in violation of Section 1344 of Title 18 of the United States Code. In order for the defendant to be found guilty of these charges, the Government must prove each of the following elements beyond a reasonable doubt as to each count:
>
> First, the defendant made up a *scheme* to defraud Heritage Bank by falsely and fraudulently requisitioning checks for amounts greater than the cost of supplies actually needed and by failing to *properly* return refund monies due the bank for items returned to Costco;
>
> Second, the defendant knowingly executed this *scheme* by failing to *properly* return refund monies;
>
> Third, the defendant acted with the intent to defraud Heritage Bank; and
>
> Fourth, Heritage Bank was insured by the Federal Deposit Insurance Corporation.

(emphasis added).

■ Oplinger contends that inclusion of the word "properly" in the foregoing instruction wrongly assumes that Heritage had an established procedure for returning defective merchandise and that the only "proper" course of action was to remit any refunds to Heritage. According to Oplinger, even if he had purchased replacement merchandise with the refunds, the jury would have been compelled to find that he had the intent to defraud Heritage if they found that he failed to return the money in cash form. Oplinger also asserts that use of the word "scheme" in the instruction was error because "[t]he word 'scheme,' in the ordinary course, implies trickery and deceit, and deceit implies intent; if you don't intend to cause some mischief, it isn't a 'scheme.'"

Oplinger has advanced a tortured construction of the district court's instruction. First, the term "properly" is used only in the sense that Oplinger should not have kept the funds for his own purposes; its inclusion did not prevent Oplinger from arguing his theory of the case. Oplinger could, and did, argue that he used the money to buy replacement merchandise at other vendors. The jurors were free to find that Oplinger lacked the fraudulent intent required by 18 U.S.C. § 1344 (and stated clearly in section 3 of instruction #9) if they believed his tale. The government acknowledged as much in its closing argument, stating that "[t]here's no evidence of any money being *properly* returned to the Bank, not to any person, not to any general ledger account, *not in any physical form, toner cartridge or otherwise.*" (emphasis added). As the government understood and emphasized to the jury, Oplinger would have *properly* returned the refund moneys if he indeed used the moneys to purchase replacement supplies; a proper return does not necessarily imply a cash return. Second, the use of the word "scheme" was in no way inappropriate; in fact, the term is used in the bank fraud statute itself. *See* 18 U.S.C. § 1344. It would be absurd indeed to hold that a jury instruction explaining the elements of a criminal statute could not rely on the actual words chosen by Congress. It was not the jury instruction that hurt Oplinger, but his failure to produce any evidence in support of his defense. Hence, we reject his challenges to the jury instruction.

## V

■ Next, Oplinger argues that the district court wrongly enhanced his sentence for abuse of a position of trust because it based its decision on the fact that he was *personally trusted* rather than on whether he occupied a *position of trust.* Oplinger contends that the former is an incorrect basis upon which to enhance a sentence under U.S.S.G. § 3B1.3. He further argues that, to qualify for a U.S.S.G. § 3B1.3 enhancement, a defendant must occupy "an unsupervised position or a supervisory position," which he claims he did not.

Oplinger may be correct that the district court enhanced his sentence pursuant to § 3B1.3 because it believed that he was personally trusted. The district court appears to have based its enhancement decision on

the fact that "the record in this case shows that [Oplinger] was hired because of his honesty and his know-how. And, therefore, [Heritage] trusted him to do whatever was necessary."

Whether an individual is personally trusted is irrelevant to the § 3B1.3 analysis; the language of the sentencing guidelines focuses only on whether a defendant "abused a *position* of public or private trust." U.S.S.G. § 3B1.3 (emphasis added). If the district court did so ground its decision in Heritage's personal trust of Oplinger, however, this alone does not necessarily warrant reversal. We may affirm on any basis supported by the record. *See First Pacific Bank v. Gilleran,* 40 F.3d 1023, 1024–25 (9th Cir.1994).

As an initial matter, Oplinger's contention that a "low-level" position such as supply coordinator cannot be considered a position of trust appears to rely on the standard announced in *United States v. Arrington,* 765 F.Supp. 945, 948–49 (N.D.Ill.1991), and subsequently rejected by the Seventh Circuit in *United States v. Lamb,* 6 F.3d 415, 418 (7th Cir.1993). As the Seventh Circuit observed, "[i]t would be contrary to logic and common sense to hold that just because a person has a 'low-level' job, he cannot be considered to occupy a position of trust." *Lamb,* 6 F.3d at 419 (noting that, although police patrolmen, firemen, probation officers, and game wardens may be at lower end of their respective department organizational charts, they occupy positions of trust). We agree. A "low-level employee" analysis would add a factor to § 3B1.3—special level of responsibility or seniority—that has no basis in the language of the guidelines. *See id.*

The controlling law in this circuit, *United States v. Hill,* 915 F.2d 502 (9th Cir.1990), teaches that "the primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *Id.* at 506. *Hill* identified two indicia of a position of trust: (1) the inability of the trusting party to determine objectively and expediently the trustee's honesty and (2) the ease with which the trusted party's activities can be observed.

*See id.* The former is characterized by the trustor's inability to discover an unlawful activity as a matter of routine, whereas the latter implicates a trustee's ability to make an undetected post-crime flight. *See id.*

The first indicium, the objective and expedient determination of honesty, weighs against Oplinger. Oplinger contends that he was under close supervision because prior approval was required for his purchases. The facts prove otherwise. Oplinger alone collected the supply requisition forms and prepared the purchase orders and check request forms. Oplinger was the only person who saw the underlying requisition slips and the only person who knew what was in Heritage's supply room. He served as supply coordinator for Heritage's six branch offices, as well as its main office, and was heavily relied upon to provide information regarding Heritage's supply needs. Once Oplinger had purchased merchandise, no one was able to check expediently whether he returned it to the retailer or distributed it to the requesting parties, or even whether there were any requesting parties. With seven locations and several thousands of dollars worth of equipment being purchased, there may have been an objective way to determine Oplinger's honesty, but there was plainly no expedient way. *See id.* at 506.

The second indicium also cuts against Oplinger because his activities were difficult to observe. His office was in the "annex" building of the Heritage complex, a self-contained building removed from his supervisors. Evidence was presented that Oplinger restricted access to the supply room, that the room was exceedingly "sloppy" and disorganized, and that it contained numerous non-Heritage items, such as candy and stuffed animals. Oplinger's supervisor testified that no one except Oplinger could tell what was actually in the supply room. Although *Hill* states that the second indicium of a difficult-to-detect wrong implicates a defendant's ability to make an undetected post-crime flight, it is unlikely that this "flight" contemplates a significant geographic movement. *See id.* at 506. In this case, the fact that Oplinger was unaccompanied when he conducted Heritage business at Costco, often used his personal

vehicle, and sometimes conducted business on holidays and weekends, all lead to the conclusion that Oplinger could pursue his scheme without detection. This is sufficient to satisfy *Hill*'s second indicium.

■ Because Oplinger occupied a position of trust, we must next determine whether he abused this position "in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. If the position of trust provided an opportunity that any other person could have seized, an enhancement is not appropriate. *See Hill,* 915 F.2d at 507.

As supply coordinator, Oplinger purchased supplies for Héritage, controlled access to the supply room, and returned defective merchandise. His position made it possible for him to purchase items Heritage did not need, return them for cash, and hide his tracks by restricting access to the supply room. No one else at Heritage would have been able to pull off this scheme without raising more than a few eyebrows. If not for Costco's phone call to his supervisor, Oplinger might still be in "business," so to speak. Obviously, Oplinger's position of trust directly contributed to the commission and concealment of his crime. The district court did not err in finding that he abused his position.

## VI

■ Oplinger next contends that the district court erred by ordering a sentence enhancement for obstruction of justice under U.S.S.G. § 3C1.1 because it failed to examine the relevant evidence and make explicit findings based upon the record. The district court found that "[t]he evidence shows that [Oplinger] did testify as [sic] a material, relevant issue of fact falsely. Therefore, he obstructed justice."

■ According to Oplinger, the district court's finding was inadequate. In support of his argument, Oplinger cites *United States v. Dunnigan,* 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), in which the Supreme Court held that "if a defendant objects to a sentence enhancement [for obstruction of justice] resulting from [his] trial testimony, a district court must review the evidence and

make the independent findings necessary to establish a willful impediment to or obstruction of justice ... under the perjury definition we have set out." *Id.* at 95, 113 S.Ct. 1111. In that case, the Supreme Court held that a witness testifying under oath or affirmation violates the perjury statute, 18 U.S.C. § 1621(1), if he gives false testimony concerning a material matter with willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory. *See id.; see also United States v. Robinson,* 63 F.3d 889, 892 (9th Cir.1995); *United States v. Ancheta,* 38 F.3d 1114, 1118 (9th Cir.1994). Once a district court has determined that a defendant has obstructed justice, the sentence enhancement is mandatory. *See Ancheta,* 38 F.3d at 1118.

First, contrary to Oplinger's assertion, the district court did review the record of the case. It explicitly stated at sentencing that "[i]n view of this *record,* there is no question in this Court's mind that he obstructed justice by falsely testifying in that first trial." (emphasis added). Oplinger's testimony from his first trial, which formed the basis for the obstruction of justice enhancement, would necessarily have been part of the record. This is enough to demonstrate that the district court considered the relevant evidence.

■ Second, although "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding," this is in no way required. *See Dunnigan,* 507 U.S. at 95, 113 S.Ct. 1111. It is sufficient for the district court to make a finding of an obstruction of justice that encompasses the factual predicates for a finding of perjury. *See id.* In *Dunnigan,* for example, the district court found "that the defendant was untruthful at trial with respect to material matters in this case." *Id.* The Supreme Court held that this finding, combined with the "numerous witnesses who contradicted respondent regarding so many facts on which she could not have been mistaken," constituted the factual predicates for perjury. *Id.* at 95–96, 113 S.Ct. 1111. Similarly, in *Ancheta,* we held that a district court's finding that a defendant obstructed justice "in providing a materially false state-

ment to a law enforcement officer that significantly obstructed or impeded that officer from the proper prosecution of the case," was also sufficient for *Dunnigan* purposes. *Ancheta*, 38 F.3d at 1118.

In this case, the government asked the district court to find that Oplinger testified falsely and willfully on a material point at his first trial when he claimed that everything he returned to Costco was damaged or defective. As related above, the district court responded that "[t]he evidence shows that he did testify as [sic] a material, relevant issue of fact falsely. Therefore, he obstructed justice." This finding, combined with the numerous witnesses and documents presented by the government demonstrating that the merchandise returned to Costco was not in fact defective or damaged,[7] is likewise sufficient to satisfy *Dunnigan*. *See Dunnigan*, 507 U.S. at 95, 113 S.Ct. 1111.[8] Therefore, we must affirm the district court's obstruction of justice enhancement.

## VII

█ Finally, Oplinger argues that he was denied effective assistance of counsel. The customary procedure for raising a claim of ineffective assistance of counsel in this court is by collateral attack under 28 U.S.C. § 2255. *See United States v. Molina*, 934 F.2d 1440, 1446 (9th Cir.1991). We prefer claimants to raise such claims in a habeas proceeding because it permits the district court to decide first whether the claim has merit, and second, if it does, to develop a record as to what counsel did, why it was done, and what, if any, prejudice resulted. *See id.* We may, however, address the merits of an ineffective assistance of counsel claim on direct appeal if the record is suffi-

ciently complete to allow us to decide the issue. *See id.*

Both Oplinger and the government contend that the record is sufficiently complete for us to decide the merits of Oplinger's ineffective assistance claim on direct appeal. We agree. We have been provided with the full transcript and record of the trial proceedings, as well as Oplinger's testimony from his first trial. That is enough here.

█ Oplinger identifies five specific deficiencies in his counsel's performance: (1) counsel's failure to move for a mistrial or object to the government's admission of testimony regarding the May 18, 1995, meeting; (2) counsel's failure to move for a mistrial or object to the government's reference to the May 18th meeting in its closing argument; (3) counsel's failure to challenge the sufficiency of the evidence concerning whether Oplinger converted the refunds to his own purposes; (4) counsel's failure to object to jury instruction # 9; and (5) counsel's failure to mount a more effective defense, specifically, his failure to call Oplinger to testify and his reliance upon the testimony of Oplinger's wife.

█ In evaluating a claim of ineffective assistance of counsel, we must first determine whether a claimant has identified material, specific errors and omissions that fall outside the "wide range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In so doing, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.* at 689, 104 S.Ct. 2052. Deficient performance alone does not require reversal; we must also de-

---

7. Costco employees testified that, as refund cashiers, they were required to ascertain the condition of all returned merchandise in order to determine whether the merchandise should be reshelved or returned to the store's vendor for credit. The evidence established that, of the hundreds of items returned by Oplinger, only two or three were defective. The testimony of the refund cashiers was corroborated by documentary evidence presented by a Costco manager that Costco had not experienced any quality control problems with the products Oplinger most frequently returned.

8. As a cautionary note, we emphasize that "not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury.... [A]n accused may give inaccurate testimony due to confusion, mistake, or faulty memory.... [An accused's] testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability ..." *Dunnigan*, 507 U.S. at 95, 113 S.Ct. 1111. This applies equally to cases, like this one, in which there is a second trial after an initial mistrial.

cide whether the claimant was prejudiced by counsel's assistance. To demonstrate prejudice, a claimant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

Regarding his first two contentions, the admission of Oplinger's silence at the May 18th meeting was constitutionally sound, as was the government's comment on that silence during its closing argument (as we have previously discussed). Moreover, the evidence was more than sufficient to convict Oplinger of bank fraud; the government was not required to present evidence that he profited from his scheme. Next, as noted above, there was no error in jury instruction # 9. Finally, Oplinger's contention that his counsel was deficient for failing to call him to testify in his own defense or to put on a more thorough defense is also meritless. Counsel's decision not to put Oplinger on the stand appears to have been well-advised. The government presented evidence that would have vitiated Oplinger's claim that he used the refund money to purchase replacement merchandise at Heritage's other vendors. Oplinger would have been forced to contradict every witness and document that came before him with no documentary or testamentary evidence in support of his claim. Counsel thoroughly cross-examined all of the government's witnesses and called Oplinger's wife to testify as to his financial stability and character.

It is unclear to us how much more rigorous a defense could have been put forth on Oplinger's behalf; there were, after all, no documents or witnesses to support Oplinger's version of the events. We hold that counsel's performance was not outside the "wide range of reasonable professional assistance," *id.* at 689, 104 S.Ct. 2052, and hence, Oplinger did not suffer from constitutionally ineffective assistance of counsel.

9. Because we affirm the district court on all counts, we need not reach Oplinger's argument

## VIII

For the foregoing reasons, the judgment of the district court is affirmed.[9]

AFFIRMED.

that, if remand is required, this case should be remanded to a judge other than Judge Tanner.