Genovevo **SALINAS**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 14–09–00395–CR.

Court of Appeals of Texas, Houston (14th Dist.).

March 17, 2011.

Discretionary Review Granted Sept. 14, 2011.

Neal Andrew Davis, Houston, for appellant.

Carol M. Cameron, Houston, for state.

Panel consists of Justices ANDERSON, FROST, and BROWN.

## OPINION

JEFFREY V. BROWN, Justice.

A jury found appellant Genovevo Salinas guilty of two counts of murder and sentenced him to twenty years' imprisonment and a $5,000 fine. Salinas appeals his conviction contending that: (1) his attorney rendered ineffective assistance at trial by failing to object to improper opinion testimony regarding Salinas's truthfulness, and (2) the trial court improperly admitted evidence of Salinas's silence during a pre-arrest interview. We affirm.

## I

Genovevo Salinas was convicted of murdering brothers Juan and Hector Garza in the early morning hours of December 18, 1992, after a night of partying at Hector's apartment. Hector's next-door neighbor, Martha Trevino, testified she was awakened around 6:30 or 6:45 a.m. by a "banging noise," which she thought was a gunshot, followed by "a scream ... like someone was scared" and more gunshots. She looked out a window and saw a man, whom she thought to be in his twenties, wearing a white hat and a long tan coat with a bulge in the side. He ran down a flight of stairs to the street where he jumped into the passenger seat of a waiting car and sped away.

Paramedics were already on the scene when Houston Police Department officers Kari Richards and Cynthia Miller arrived shortly after 7:00 a.m. The officers learned Juan was dead inside the apartment. Hector was still alive but would be later pronounced dead at the hospital. The officers were unable to locate any witnesses at the scene except for Trevino, who described the getaway car as dark-colored Camaro or Trans Am. Crime Scene Unit officer James Davis investigated the murder scene and found no signs of forced entry or any weapons in the house. He recovered six shotgun shells from around the doorway of the apartment and in the living room. Investigators canvassed the apartment complex but were unable to identify any suspects.

Police were eventually able to identify some of the people who attended the party the night before the shooting, and several cooperated with the investigation. Alberto "Flaco" Paredes testified he dropped Juan off at the apartment after work. He also testified that he had seen a black Trans Am in the area a few weeks before the shooting and saw the same car in the apartment complex parking lot the night before the shooting. Gilbert "Roland" Ledesma testified that two men he did not know left the party in a dark-colored Trans Am. Also at the party was Mike Provazek, who referred police to Damien Cuellar. Cuellar apparently was not at the apartment but had information that led police to Salinas. Although it is not clear from the trial transcript, it appears Cuellar either told police Salinas was at the party the night before the shooting, that Salinas owned a shotgun, or both.

Investigators went to Salinas's home, where he lived with his parents. In the driveway was both a red Camaro or Trans Am and a dark blue Camaro or Trans Am. Police would later learn that Salinas owned the red car while his mother drove the dark blue car. The investigators told the Salinas family about the murder investigation and obtained consent to search the home. Salinas's father tendered a shotgun to the police. Salinas agreed to voluntarily accompany the officers to a police station for questioning.

Sergeant C.E. Elliott of the Houston Police Department testified at trial that he questioned Salinas at the police station for nearly an hour. During the questioning, Salinas told Sergeant Elliott he knew the Garza brothers through Mike Provazek and had visited the apartment three or four times before the shooting. According to Sergeant Elliott's testimony, Salinas said he had no disagreement with either of the Garza brothers and did not own any weapons aside from the shotgun police took into custody. At that point in Sergeant Elliott's testimony, the prosecutor approached the bench, where the following exchange took place:

Ms. Garcia [Prosecutor]: Your Honor, there was a Motion in Limine granted that we should not be going into the defendant remaining silent when asked

if the ballistics from his shotgun were going to match the shotgun shells found at the apartment. And at this time, we'd like to be able to go into that and show Sergeant Elliott's testimony. The defendant was not in custody at this time. He was free to leave and he was merely there for investigatory purposes.

The Court: Was this part of the same conversation that we just heard?

Ms. Garcia: Yes, Your Honor, same conversation.

Mr. McWilliams [Salinas's counsel]: Judge, I renew my same objection, that he has—he can invoke the Fifth Amendment privilege whether he was in custody or not. He doesn't have to talk to the police.

The Court: Okay. I agree, but unless you know that, in fact, he did do that.

Mr. McWilliams: He remained silent, Judge.

The Court: Okay. Thank you.

The court went off the record before Sergeant Elliott's examination resumed. A little later, the following exchange, which forms the basis of both of Salinas's issues on appeal, took place:

Q. Did you ask him, Sergeant Elliott, if the shotgun in question here would match the shells recovered at the scene of the murder?

A. Yes.

Mr. McWilliams: I renew the objection.

The Court: The objection is overruled.

Q. (By Ms. Garcia) You can answer the question.

A. Yes, I did ask him that.

Q. And what was his answer?

A. He did not answer.

Q. Did he make any motions after that? Did he—

A. Yes.

Q. What did he do?

A. Showed signs of deception.

Q. And what were they?

Mr. McWilliams: Object to that, Judge, as calling for speculation.

The Court: Sustained.

Mr. McWilliams: I ask that the jury be instructed to disregard that.

The Court: The jury—the objection is sustained. The jury will disregard the last statement of the officer.

Q. (By Ms. Garcia) Sergeant Elliott, what specifically did the defendant do after he remained silent when you asked him that question?

A: Looked down at the floor, shuffled his feet, bit his bottom lip, clinched his hands in his lap, began to tighten up.

Q: Did you continue to question him after that?

A: Yes.

Q: And did you ask him—did he answer any more questions?

A: Yes.

* * *

Q: So, Sergeant Elliott, approximately how many questions would you say the defendant answered on that evening of your conversation?

A: I've never counted the questions before because this was just talking.

Q: Well, let me ask it this way if that's difficult to answer. About how long did this conversation last, if you remember?

A: Two minutes short of an hour.

Q: So, in this 58 minutes that you talked to Genovevo Salinas on January 28th of 1993, how many questions did he not answer?

A: One.

* * *

Q: So, what changed before this conversation to alter this conversation to cause you to take him into custody?

A: My opinion.

Q: And how did your opinion change?

A: I had the opinion that he was being deceptive and lying to me and I wanted to hold on to him.

After the interview, Sergeant Elliott arrested Salinas on some outstanding traffic warrants. The ballistics analysis matched Salinas's shotgun with the casings left at the murder scene. However, the Harris County District Attorney's office declined charges, and Salinas was released. Police procured an additional statement from Cuellar, who, according to Sergeant Elliott, came to the police station unannounced and unsolicited to offer a third statement in which he said Salinas confessed he had murdered the Garza brothers. Cuellar testified that Salinas was his friend and that he hoped police would solve the murder without his help, but after a dream in which he saw the Garza brothers he felt compelled to come forward. Salinas was then charged with murder but eluded arrest until 2007, when he was arrested while maintaining a false identity. Salinas's first trial resulted in a mistrial, but the jury in his second trial found him guilty and sentenced him to twenty years' imprisonment and a $5,000 fine.

## II

Salinas's first issue is his ineffective-assistance-of-counsel claim. He complains that his trial counsel failed to object when Sergeant Elliott opined that Salinas was "deceptive and lying." Salinas argues this testimony was an inadmissible opinion of Salinas's truthfulness, and trial counsel's failure to object prejudiced his defense.

## A

An accused is entitled to reasonably effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *King v. State,* 649 S.W.2d 42, 44 (Tex.Crim.App.1983). In reviewing claims of ineffective assistance of counsel, we apply a two-prong test. *See Mallett v. State,* 65 S.W.3d 59, 62 (Tex.Crim.App.2001). To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that (1) his trial counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Mallett,* 65 S.W.3d at 62–63. If a criminal defendant can prove that trial counsel's performance was deficient, he must still affirmatively prove that counsel's actions prejudiced him. *Thompson v. State,* 9 S.W.3d 808, 812 (Tex.Crim.App.1999). To demonstrate prejudice, a defendant must establish a reasonable probability that the result of the proceeding would have been different if trial counsel had acted professionally. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Mallett,* 65 S.W.3d at 63.

When evaluating a claim of ineffective assistance, the appellate court looks to the totality of the representation and the particular circumstances of each case. *Thompson,* 9 S.W.3d at 813. In making such an evaluation, any judicial review must be highly deferential to trial counsel and avoid the distorting effects of hindsight. *Ingham v. State,* 679 S.W.2d 503, 509 (Tex.Crim.App.1984) (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Accordingly, there is a strong presumption that counsel's conduct fell within a wide range of reasonable representation. *Sali-*

*nas v. State*, 163 S.W.3d 734, 740 (Tex. Crim.App.2005). The appellant bears the burden of proving by a preponderance of the evidence that counsel was ineffective. *Thompson*, 9 S.W.3d at 813 (citing *Cannon v. State*, 668 S.W.2d 401, 403 (Tex.Crim. App.1984)). To overcome the presumption of reasonable professional assistance, any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Id.* at 814. Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex.Crim.App.2005). But, when no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as he did. *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim.App.2005).

B

 The determination of a witness's truthfulness lies solely within the jury's province. *Yount v. State*, 872 S.W.2d 706, 710 (Tex.Crim.App.1993). Texas Rule of Evidence 702 prohibits expert witnesses from directly testifying that a particular witness is truthful. Tex.R. Evid. 702; *see Yount*, 872 S.W.2d at 711; *Schutz v. State*, 957 S.W.2d 52, 59 (Tex.Crim.App.1997). Non-expert testimony may be offered to support the credibility of a witness by offering an opinion or reputation evidence as to the witness's character for truthfulness or untruthfulness, but lay witnesses may not testify to the witness's truthfulness in the particular allegations. *See* Tex.R. Evid. 608(a)(1); *Schutz*, 957 S.W.2d at 72. While the prosecutor did not directly ask Sergeant Elliott for his opinion as to Salinas's truthfulness, Sergeant Elliott's response can be understood only as a statement that he generally disbelieved Salinas's insistence that he was not involved in the murders. This assessment invaded the province of the jury; it would have been proper for defense counsel to both object to this testimony and request an instruction to disregard Sergeant Elliott's statement. *See Yount*, 872 S.W.2d at 710–11.

Presuming without deciding that counsel's failure to object to this testimony would satisfy the first prong of *Strickland*, appellant's ineffective-assistance claim still fails because the second *Strickland* prong is not satisfied. Salinas has not shown a reasonable probability that, but for counsel's presumptively deficient performance, the result of the trial would have been different. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *Mallett*, 65 S.W.3d at 63.

It is true that other courts have found that a failure to object to improper opinion testimony was sufficient to undermine confidence in the outcome of the case. *See Fuller v. State*, 224 S.W.3d 823, 836–37 (Tex.App.-Texarkana 2007, no pet.); *Sessums v. State*, 129 S.W.3d 242, 248 (Tex. App.-Texarkana 2004, pet. ref'd); *Miller v. State*, 757 S.W.2d 880, 884 (Tex.App.-Dallas 1988, pet. ref'd); *Garcia v. State*, 712 S.W.2d 249, 253 (Tex.App.-El Paso 1986, pet. ref'd). However, each of these instances arose from sexual-assault or indecency-with-a-child cases in which, as the *Fuller* court recognized, "the victim's credibility was the only real issue at trial and counsel repeatedly or entirely failed to object to the introduction of testimony on the truthfulness and credibility of the victim's allegations." *Fuller*, 224 S.W.3d at 836. In these cases, the deleterious effect of counsel's failure to object to improper opinion testimony was worsened because the allegations hinged on the victim's credibility.

We previously noted this distinction in *Lane v. State*, another sexual-assault-against-a-child case in which trial counsel failed to object to two expert reports containing opinion testimony concerning the complainant's truthfulness. 257 S.W.3d 22, 27 (Tex.App.-Houston [14th Dist.] 2008, pet. ref'd). We held the second *Strickland* prong had not been satisfied because the complainant's sister offered testimony corroborating the complainant's allegations. *Id.* at 28–29. Therefore, "resolution of the credibility issue was not dependent upon the challenged expert testimony." *Id.* at 29.

■ Similarly, the case before us does not hinge on a single witness's credibility. The evidence against Salinas includes Cuellar's testimony that Salinas confessed to the crimes, ballistics testing that matches a shotgun in the Salinas family home to the crime scene, and two cars at the Salinas family home that are potential matches of the car Martha Trevino described as fleeing the apartment complex immediately after the shootings. Additionally, we note that the failure to object to improper opinion testimony in this case occurred only once. Moreover, the State did not ask the witness to opine on Salinas's truthfulness; instead, the witness offered the opinion as an answer to why he arrested Salinas. By contrast, in the sexual-assault-against-a-child cases in which a *Strickland* claim was sustained, counsel "repeatedly or entirely failed to object to the introduction of testimony on the truthfulness and credibility of the victim's allegations." *Fuller*, 224 S.W.3d at 836. It has long been a principle of an ineffective-assistance-of-counsel analysis that "[a]n isolated failure to object to certain procedural mistakes or improper evidence does not constitute ineffective assistance of counsel." *Ingham*, 679 S.W.2d at 509. We overrule Salinas's first issue.

## III

In his second issue Salinas asserts the trial court erred in admitting testimony of his pre-arrest, pre-*Miranda* silence. Sergeant Elliott testified that Salinas remained silent when asked if ballistics testing on the shotgun his father surrendered to police would match the shell casings found at the murder scene. According to Sergeant Elliott, Salinas showed "signs of deception" when he failed to respond: looking down at the floor, shuffling his feet, biting his bottom lip, clinching his hands in his lap, and tightening up. Sergeant Elliott further testified that Salinas answered every question but this one during the nearly hour-long interview. Defense counsel objected to the testimony on the grounds that Salinas had invoked his Fifth Amendment privilege against self-incrimination by remaining silent. The trial court overruled the objection. During closing argument, the prosecutor argued, over defense counsel's objection, that Salinas's silence was evidence of his guilt:

> The police officer testified that he wouldn't answer that question. He didn't want to answer that. Probably the first time he realizes you can do that. What? You can compare those? You know, if you asked somebody—there is a murder in New York City, is your gun going to match up the murder in New York City? Is your DNA going to be on that body or that person's fingernails? Is [sic] your fingerprints going to be on that body? You are going to say no. An innocent person is going to say: What are you talking about? I didn't do that. I wasn't there. He didn't respond that way. He didn't say: No, it's not going to match up. It's my shotgun. It's been in our house. What are you talking about? He wouldn't answer that question.

We must determine whether the Fifth Amendment prohibits the use of Salinas's pre-arrest, pre-*Miranda* silence as substantive evidence of his guilt.

■ The law is clear that if a defendant testifies, his pre-arrest silence can be used to impeach him. *See Jenkins v. Anderson,* 447 U.S. 231, 238–40, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). The use of pre-arrest silence to impeach does not violate the Fifth Amendment because "impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." *Id.* at 238, 100 S.Ct. 2124. Still, the United States Supreme Court has yet to decide what protections, if any, the Fifth Amendment affords to pre-arrest silence when the defendant does not testify

and his silence is introduced by the State not for impeachment but in its case-in-chief.[1]

There is little precedent from Texas courts to provide guidance. In *State v. Lee,* the prosecutor referred to the defendant's pre-arrest silence in an opening statement. 15 S.W.3d 921, 922 (Tex.Crim. App.2000), *overruled on other grounds, Ex Parte Lewis,* 219 S.W.3d 335 (Tex.Crim. App.2007). The Court of Criminal Appeals determined that, under the uncertain state of the law at that time, the prosecutor's actions could not have been intentional or reckless and clearly erroneous.[2] *Id.* at 924–26. A sister court of appeals has addressed the issue, but did not ultimately decide it.[3] *Hennessy v. State,* 268 S.W.3d

1. The question before the *Jenkins* court was whether pre-arrest silence could be used to impeach a testifying defendant. The Court had previously held that cross-examining a testifying defendant at his second trial with his decision not to testify at his first trial was not an impermissible burden on the defendant's Fifth Amendment rights. *See Raffel v. United States,* 271 U.S. 494, 499, 46 S.Ct. 566, 70 L.Ed. 1054 (1926). The *Jenkins* court held a testifying defendant could be impeached with pre-arrest silence because "the rule of *Raffel* clearly permits impeachment even if the pre[-]arrest silence were held to be an invocation of the Fifth Amendment right to remain silent." *Jenkins,* 447 U.S. at 235 n. 2, 100 S.Ct. 2124. Accordingly, the *Jenkins* court did not consider whether or under what circumstances pre-arrest silence may be protected by the Fifth Amendment. *See id.*

2. The court in *Lee* provided a survey of decisions from other states addressing this issue. 15 S.W.3d at 924 n. 5. Some courts have held that pre-arrest, pre-*Miranda* silence is not admissible as substantive evidence of guilt. *State v. Moore,* 131 Idaho 814, 965 P.2d 174, 180 (1998); *State v. Dunkel,* 466 N.W.2d 425, 428–29 (Minn.Ct.App.1991); *State v. Rowland,* 234 Neb. 846, 452 N.W.2d 758, 763–64 (1990); *People v. DeGeorge,* 73 N.Y.2d 614, 543 N.Y.S.2d 11, 541 N.E.2d 11, 13 (1989); *Hartigan v. Commonwealth,* 31 Va.App. 243, 522 S.E.2d 406, 410 (1999); *State v. Easter,*

130 Wash.2d 228, 922 P.2d 1285, 1291–92 (1996); *Tortolito v. State,* 901 P.2d 387, 390 (Wyo.1995). Courts in other states have held that pre-arrest, pre-*Miranda* silence does not implicate the Fifth Amendment. *State v. Leecan,* 198 Conn. 517, 504 A.2d 480, 484 (1986); *Key–El v. State,* 349 Md. 811, 709 A.2d 1305, 1310–11, *overruled by Weitzel v. State,* 384 Md. 451, 863 A.2d 999, 1002, *cert. denied,* 525 U.S. 917, 119 S.Ct. 267, 142 L.Ed.2d 220 (1998); *State v. Masslon,* 746 S.W.2d 618, 626 (Mo.Ct.App.1988); *State v. Dreher,* 302 N.J.Super. 408, 695 A.2d 672, 705 (App.Div.1997), *disapproved by State v. Brown,* 190 N.J. 144, 919 A.2d 107, 116 n. 1 (N.J. 2007), *cert. denied,* 152 N.J. 10, 702 A.2d 349 (1997), *cert. denied,* 524 U.S. 943, 118 S.Ct. 2353, 141 L.Ed.2d 723 (1998); *State v. Helgeson,* 303 N.W.2d 342, 348–49 (N.D.1981).

3. In *Hennessy,* the Waco court of appeals cited several commentators who have written on this issue and noted the split of authority. 268 S.W.3d at 161 n. 2. Some have concluded that pre-arrest silence ought to be protected by the Fifth Amendment and inadmissible as substantive evidence of guilt. *See* Meaghan Elizabeth Ryan, Comment, *Do You Have the Right to Remain Silent?: The Substantive Use of Pre–Miranda Silence,* 58 ALA. L.REV. 903 (2007); Sara Ciarelli, *Pre-arrest Silence: Minding that Gap Between Fourth Amendment Stops and Fifth Amendment Custody,* 93

153, 161 (Tex.App.-Waco 2008, pet. ref'd) (assuming without deciding Fifth Amendment does not permit use of pre-arrest silence as substantive evidence of guilt).

The federal courts of appeals are split on the issue. The First, Sixth, Seventh, and Tenth Circuits have held that pre-arrest, pre-*Miranda* silence is not admissible as substantive evidence of guilt. *Combs v. Coyle,* 205 F.3d 269, 283 (6th Cir.2000), *cert. denied,* 504 U.S. 977, 112 S.Ct. 2950, 119 L.Ed.2d 573 (1992); *United States v. Burson,* 952 F.2d 1196, 1200–01 (10th Cir.1991), *cert. denied,* 503 U.S. 997, 112 S.Ct. 1702, 118 L.Ed.2d 411 (1992); *Coppola v. Powell,* 878 F.2d 1562, 1568 (1st Cir.1989), *cert. denied,* 493 U.S. 969, 110 S.Ct. 418, 107 L.Ed.2d 383 (1989); *United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1017–18 (7th Cir.1987). The Fifth, Ninth, and Eleventh Circuits, on the other hand, have held that pre-arrest, pre-*Miranda* silence is admissible as substantive evidence of guilt. *United States v. Oplinger,* 150 F.3d 1061, 1066–67 (9th Cir.1998), *overruled on other grounds, United States v. Contreras,* 593 F.3d 1135 (9th Cir.2010) (per curiam); *United States v. Zanabria,* 74 F.3d 590, 593 (5th Cir.1996); *United States v. Rivera,* 944 F.2d 1563, 1568 (11th Cir.1991).

We agree with the Fifth, Ninth, and Eleventh Circuits. The Fifth Amendment provides that "[n]o person . . . shall be *compelled* in any criminal case to be a witness against himself." U.S. Const. amend. V (emphasis added). A plain reading of the amendment reveals that only government compulsion triggers its protections against self-incrimination. The Fifth Amendment does not "preclude the proper evidentiary use and prosecutorial comment about *every* communication or *lack* thereof by the defendant which may give rise to an incriminating inference." *Zanabria,* 74 F.3d at 593 (emphasis in original). The otherwise proper acquisition or use of evidence which does not involve compelled testimonial self-incrimination of some sort does not offend the Fifth Amendment. *See Fisher v. United States,* 425 U.S. 391, 399, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). Absent a showing of government compulsion, the Fifth Amendment simply has nothing to say on the admissibility of pre-arrest, pre-*Miranda* silence in the State's case-in-chief. We therefore hold the Fifth Amendment has no applicability to pre-arrest, pre-*Miranda* silence used as substantive evidence in cases in which the defendant does not testify.

In his concurrence in *Jenkins,* Justice Stevens first advanced the rationale supporting our holding. Because the privilege against compulsory self-incrimination is irrelevant to whether one remains silent when under no official compulsion to speak, Justice Stevens would have rejected the defendant's Fifth Amendment claim.

J.Crim. L. & Criminology 651 (2003); Marcy Strauss, *Silence,* 35 Loy. L.A. L.Rev. 101 (2001); Maria Noelle Berger, Note, *Defining the Scope of the Privilege Against Self–Incrimination: Should Prearrest Silence be Admissible as Substantive Evidence of Guilt?,* 1999 U. Ill. L.Rev. 1015 (1999); Jane Elinor Notz, Comment, *Prearrest Silence as Evidence of Guilt: What You Don't Say Shouldn't Be Used Against You,* 64 U. Chi. L.Rev. 1009 (1997).

Others have not. *See* Michael J. Hunter, *The Man on the Stairs Who Wasn't There: What Does a Defendant's Pre-arrest Silence Have to do with Miranda, the Fifth Amendment, or Due Process?,* 28 Hamline L.Rev. 277 (2005); Adam M. Stewart, *The Silent Domino: Allowing Pre-arrest Silence as Evidence of Guilt and the Possible Effect on Miranda,* 37 Suffolk U.L.Rev. 189 (2004); Jeffrey D. Waltuck, Comment, *Remaining Silent: A Right with Consequences,* 38 J. Marshall L.Rev. 649 (2004); Stefanie Petrucci, Comment, *The Sound of Silence: The Constitutionality of the Prosecution's Use of Prearrest Silence in its Case–in–Chief,* 33 U.C. Davis L.Rev. 449 (2000).

*See Jenkins,* 447 U.S. at 241, 100 S.Ct. 2124 (Stevens, J., concurring). We agree with Justice Stevens that the proper inquiry is "whether the petitioner was in a position to have his testimony compelled and then asserted his privilege, not simply whether he was silent." *Id.* at 241, 243–44, 100 S.Ct. 2124. A contrary view ignores the unambiguous words of the Fifth Amendment. *See Oplinger,* 150 F.3d at 1067.

■ Salinas does not argue he was in custody during the interview, and Sergeant Elliott testified Salinas was never handcuffed and was free to leave. Salinas's interview is therefore properly categorized as a voluntary encounter with police. *See Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *State v. Larue,* 28 S.W.3d 549, 553 n. 8 (Tex.Crim.App.2000). *Miranda* warnings, therefore, were neither issued nor required. There was no government compulsion in the pre-arrest, pre-*Miranda* questioning in which Salinas voluntarily participated for almost an hour. Accordingly, the Fifth Amendment privilege against self-incrimination was not triggered and did not prevent the State from offering Salinas's failure to answer the question at issue. *See Oplinger,* 150 F.3d at 1067. We overrule Salinas's second issue.

\* \* \*

For the foregoing reasons, we affirm the trial court's judgment.