

# In the Court of Criminal

# Appeals of Texas

No. WR-90,982-01

EX PARTE GENOVEVO SALINAS SALINAS,

*Applicant*

On Application for a Writ of Habeas Corpus
Cause No. 656545-A from the 230th District Court
Harris County

YEARY, J., delivered the opinion of the Court, in which KELLER, P.J., and RICHARDSON, SLAUGHTER, and MCCLURE, JJ., joined. HERVEY, J., concurred in the result. WALKER, J., dissented. NEWELL and KEEL, JJ., did not participate.

In this post-conviction application for writ of habeas corpus proceeding, Applicant challenges the constitutional effectiveness of his trial counsel at his second murder trial. TEX. CODE CRIM. PROC. art.

11.07. The underlying offense involved the double homicide of Juan and Hector Garza, committed in December of 1992.[1] Aware that the police suspected him of the crime, Applicant absconded and was not arrested until 2007. Applicant's first trial, in 2008, resulted in a hung jury. But a different jury found him guilty at his second trial in 2009, and it assessed his punishment at confinement in the penitentiary for twenty years and a $5,000 fine.

Applicant's trial attorneys were the same for both trials. He argues here that they performed deficiently at his second trial, primarily by allowing the admission of evidence that he stood mute—saying nothing at all—when investigating officers posed one particular question during an interview at the station house in January of 1993. The investigating detectives asked Applicant whether forensic toolmark examination would reveal that the shotgun recovered from his parents' home, where he lived at the time of the offense, was the weapon used to kill the Garzas. Applicant, who had waived his right to silence and readily responded to their questions up to that point, would not answer.

At Applicant's second trial, in 2009, trial counsel objected to the admission of this evidence based upon Applicant's Fifth Amendment privilege not to be compelled to be a witness against himself, arguing that his pretrial silence could not constitutionally be used against him regardless of whether he was in custody at the time of the interview. U.S. CONST. amend. V. Applicant pursued this argument on direct

---

[1] Applicant was only charged with the murder of Juan Garza—not the capital murder of both. The indictment alleged that Applicant intentionally and knowingly caused Juan Garza's death by shooting him with a deadly weapon. TEX. PENAL CODE § 19.02(a)(1).

appeal, *Salinas v. State*, 368 S.W.3d 550 (Tex. App.—Houston [14th Dist.] 2011), on petition for discretionary review, *Salinas v. State*, 369 S.W.3d 176 (Tex. Crim. App. 2012), and ultimately on petition for certiorari to the United States Supreme Court, *Salinas v. Texas*, 570 U.S. 178 (2013) (plurality opinion). His contention was rejected at every stage, on various grounds.

Applicant now argues that trial counsel at the second trial performed in a constitutionally deficient manner by failing to object to the use of his pre-trial silence *on two other grounds*. First, he argues that trial counsel should have objected that admission of the evidence of his silence violated the Fourteenth Amendment's Due Process Clause as "fundamentally unfair" because it came after he was cautioned by police, pursuant to the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), that his silence could *not* be used against him. *See Doyle v. Ohio*, 426 U.S. 610, 619 (1976) ("We hold that the use for impeachment purposes of petitioner's silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment.").[2] And second, he argues that trial counsel could and should have kept the evidence of his refusal to answer out because it was elicited as part of an oral statement made while Applicant was in police custody, and such statements are inadmissible as a matter of state law unless they are electronically recorded. *See* TEX. CODE CRIM.

---

[2] Justice Alito pointed to this holding from *Doyle* in a footnote to the Supreme Court's plurality opinion on certiorari in Applicant's case. *Salinas*, 570 U.S. at 188 n.3 ("Petitioner is correct that *due process* prohibits prosecutors from pointing to the fact that a defendant was silent after he heard *Miranda* warnings[.]").

PROC. art. 38.22 § 3(a)(1) ("No oral . . . statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless . . . an electronic recording . . . is made of the statement[.]").

Applicant contends that the prosecutor's emphasis upon his failure to respond to the question of whether forensic testing would reveal that his shotgun was the murder weapon made all the difference between a hung jury at his first trial and a conviction at his second. Thus, he argues, he has adequately established prejudice for purposes of his Sixth Amendment claim of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984) (in order to establish the prejudice prong of a Sixth Amendment claim of ineffective assistance of counsel, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

The convicting court has recommended that we grant Applicant a new trial based upon the failure to challenge his pretrial silence on the basis of either or both of these legal theories: (1) *Doyle* and (2) Article 38.22. It also found that trial counsel performed deficiently in a handful of other comparatively trivial ways which, together with their failure to prevent the admission of Applicant's pretrial silence, coalesced to undermine confidence in the outcome of his second trial. *See id.* ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."). We ultimately reject the convicting court's recommendation to grant relief. We filed and set the case in order to explain why.

## I. BACKGROUND

### A. The Offense Report[3]

Juan and Hector Garza were gunned down in the pre-dawn hours of December 18, 1992, in Hector's small apartment in Houston, both felled by close-range shotgun blasts. Police arrived shortly thereafter. Two shotgun shell casings were recovered by the front door to the apartment, and four more were recovered in the front room of the apartment. The police had no immediate suspects, but they eventually learned that Applicant had been at the apartment the night before until about 10 o'clock with a friend, Mike Provazek, and that Applicant owned a shotgun.

On January 11, 1993, Houston Police Department Homicide Sergeants Wayne Wendel and W. O. Allen made first contact with Appellant at his home, where he lived with his parents. Applicant was cooperative, but he could not remember very many details. He admitted he had gone to the Garza's apartment with Provazek, and that he smoked crack cocaine and drank beer while he was there. He could not remember who else came by or what time Provazek took him home.

Later, police received a tip from crime stoppers that Applicant was the person who committed the murders. As a result, on the evening of January 28, 1993, Sergeant Wendel, this time along with Sergeant Carlos Elliott, again contacted Applicant at his home and asked for consent to search for the shotgun. Both Applicant and his father signed consent forms, and Applicant's father produced a shotgun from his own

---

[3] A copy of the Houston Police Department offense report was admitted as an exhibit at the writ hearing in 2019. The facts as set out in this subsection of our opinion were gleaned from that offense report.

bedroom and relinquished it to the officers.

Sergeant Wendel "retained" the shotgun at that time for comparison to the casings left at the murder scene, and the officers asked Applicant to accompany them to the police station to be fingerprinted and photographed "for elimination purposes." Applicant agreed to go and was transported to the homicide office. He was first Mirandized by Wendel at 6:43 p.m., and he acknowledged that he understood his rights. At that point, he simply "denied any involvement in the case." The officers took a short break and provided Applicant a cup of coffee; Applicant "was also smoking cigarettes." Then, Sergeant Allen (who had joined the other officers by this time) read Applicant his rights for a second time, this time "from the top of a 'Statement of Person in Custody' form," after which Applicant initialed each listed right. He also initialed a declaration on the form to say that he "intelligently and voluntarily waive[d]" those rights in order to "make the following voluntary statement." "This was at" 6:56 p.m. What followed was not memorialized on the statement form, or by electronic recording, or in any other manner, other than by the officers' descriptions in the offense report itself, which Applicant did not endorse.

Applicant admitted to the officers that he knew Juan and Hector, and that he had been at their apartment the night before the killing with his friend, Mike Provazek. He acknowledged having mutual friends with the Garza brothers, including Damien Cuellar (about whom more will be said later). Applicant admitted they had been "smoking some 'rocks'" of crack cocaine and drinking beer, and that he left with Provazek, who took him straight home. He denied having had "any type of

disagreement" with the Garzas.

Sergeant Allen then asked Applicant whether he "had any other gun's [sic] than the shotgun[,]" which Applicant denied. Next, as recounted in the offense report: "Sgt. Allen asked [Applicant] if the shotgun would match the shells recovered from the scene and [Applicant] would not answer the question." But Applicant went on to answer questions about what he had done the following morning, claiming that he had been hung over, had called in sick to work, and had returned to bed until early afternoon. He claimed he did not learn about the killings until the weekend after it happened, when Mike Provazek and Damien Cuellar informed him. And with that, according to the offense report, Applicant "had nothing further to say" about the case, and the interview concluded at 7:45 p.m.

A forensic examination, conducted the next day (January 29th), revealed that the six shotgun shells found at the murder scene had indeed been fired from the shotgun recovered from Applicant's home. Applicant, who had been detained temporarily in the city jail for a number of outstanding capias pro fines, was informed of the outcome of the forensic testing, and again "had nothing to say." He was apparently nevertheless released on January 30th. By the time police obtained an arrest warrant on the murder charge, on February 1st, Applicant had disappeared, and he was not arrested until November of 2007. He was found to have been using an alias.

### B. The First Trial[4]

---

[4] The convicting court took judicial notice of the record of Applicant's first and second trials, both of which we have reviewed. We find no indication that trial counsel challenged the admissibility of the evidence of Applicant's

Sergeant Wendel was the first witness to testify at Applicant's initial trial in late June of 2008. He confirmed that he spoke to Applicant on January 11th, 1993, and that Applicant told him that he had been at Hector Garza's apartment on December 17th, with Provazek, smoking "crack" cocaine and drinking beer. Wendel made no mention of Applicant's oral statement at the station house on January 28th.

Later, Sergeant Elliott also testified. Like Wendel, Elliott relayed no information about Applicant's January 28th statement—at least not during his direct examination.[5] On cross-examination, Elliott said that he and Wendel had gone to Applicant's home that day both to retrieve the shotgun and "to interview [Applicant] in depth[.]" Applicant's counsel then asked Elliott if Applicant had "confessed" to the offense:

Q. So, you take him into custody on January 28th. Did he ever confess to the kidnapping?

A. No.

Q. You certainly asked him some tough questions, though, didn't you?

A. Yes.

refusal to answer the question regarding what forensic examination of the shotgun would reveal by way of pretrial motion or evidentiary hearing conducted before either the first or second trial.

[5] Asked during his direct examination whether the officers had arrested Applicant after they obtained the shotgun from him, Elliott seems to have alluded to Applicant's statement when he answered: "We brought him downtown to talk to him. After talking to him and the inconsistencies and we checked him --". Trial counsel's objection that the answer was non-responsive was sustained and the jury was instructed to disregard Elliott's answer. He went on to testify that they arrested Applicant for failure to pay traffic tickets.

Before the State's re-direct, the prosecutor approached the bench and argued that this colloquy had opened the door to questioning Elliott about Applicant's oral statement. Applicant declared that he would object to any testimony about the oral statement.

When the prosecutor later broached that topic with Elliott, Applicant indeed objected and asked the prosecutor to "nail down the time frame" so that it could be determined "whether that's after he has been placed in custody or before." The trial court suggested that Applicant's counsel voir dire Elliott on that question. On voir dire, Elliott testified that "[w]e talked to [Applicant] at his house and at the station, but a lot of it was at the house there with his dad about the gun and all." Once they got Applicant to the police station, Elliott maintained, "we were just going to interview him." But he also asserted that Applicant would not have been free to leave. Applicant's counsel then objected that "any custodial statement is still going to be governed by the Code[.]" In reply, the prosecutor again insisted that Applicant's cross-examination of Elliott had opened the door to evidence of Applicant's oral statement. Without explicitly ruling on Applicant's objection, the trial court instructed the prosecutor that the State had "to establish whether or not [Applicant] was" in custody.

Taking Elliott back on re-direct, the prosecutor elicited Elliott's opinion that, at least when they had first reached the police station, Applicant was not in custody. Asked by the prosecutor whether Applicant had been free to leave, Elliott answered:

> We had been back to the station and we were realizing that we were beginning to move in that direction, he had went from being a witness to being a suspect. So, we stopped the

> interview and Mirandized him, gave him his warnings on the form. * * * It started off as a conversation between three men and moved over into an interview of a suspect.

Applicant then renewed his objection, apparently invoking Article 38.22, Section 3, when he said, " I object at this point unless we can get whether or not that [interview] is in writing or on videotape or audiotape." When the prosecutor promised "to do that[,]" the trial court overruled Applicant's objection "at this point."

What Elliott said next is, frankly, somewhat murky. The prosecutor asked him what Applicant had told the officers *at the house*, before being transported to the police station. Elliott indicated that Applicant had told them everything that *the offense report* indicates he told them *after* he was Mirandized *at the station*: namely, that he had been to the Garzas' apartment with Provazek the night before, smoking crack and drinking; that he stayed home hung over the next morning; and that he later learned about the killing from Provazek and Cuellar. Still apparently describing the conversation *at the house*, Elliott said they asked for Applicant and his father to produce the shotgun. Almost immediately after that, the following colloquy occurred (leaving the definite impression that Applicant's refusal to answer the question happened *at the house*, not during the statement at the police station):

> Q.  . . . When they brought the shotgun to you, did you ask any questions about the shotgun to the defendant?
>
> A.  Yes.
>
> Q.  What did you ask him?
>
> A.  I asked him if the shotgun -- I recognized it was a .12-

gauge. If the gun was going to match the shotgun used at the murder scene.

Q. And why did you ask that question?

A. Hopefully, if there was a logical answer he would tell me.

Q. Was he able to answer that question?

A. No, he would not. Did not. Just kind of ignored it. You asked a question and it just sat there.

Applicant did not renew his objection at this point.[6] But neither did Applicant's trial counsel use the offense report to impeach Elliott's testimony, or to try to refresh his memory, with respect to *where* the statement occurred.

The prosecutor's closing argument at the guilt stage of trial reinforced this impression when he argued:

And when [Applicant and his father] brought out his father's shotgun, the police asked -- police like to dig in stuff like this.

Hey, we're going to take this back to the lab. We're going to check to see if this was the shotgun. Is it going to come back to a match?

What was the defendant's response?

Just looked at them and said nothing.

---

[6] Not only did Elliott claim—contrary to the offense report—that Applicant's silence occurred at the house, not the police station, he also claimed to have been the one to pose the question, even though the offense report plainly declared that Sergeant Allen had done so. For undisclosed reasons, Allen did not testify at either trial.

Applicant made no objection to this argument. Applicant's first trial ended in a mistrial when the jury was unable to reach a unanimous verdict after a full day of deliberations.

## C. The Second Trial

Applicant's second trial for the murder of Juan Garza began less than a year after the first, in March of 2009. Sergeant Wendel did not testify again at the second trial, but Sergeant Elliott did. Different prosecutors represented the State at the second trial, and a different judge presided, while Applicant's lawyers were the same. Evidence of Applicant's refusal to answer the investigators' pointed question about the likely result of forensic testing of the shotgun developed quite differently at the second trial.

On the morning of the first day of testimony, the new prosecutor announced that he wanted to mention Applicant's refusal to answer in his opening statement to the jury, which he considered a "very important piece of evidence[.]" He argued that, from his review of both the offense report and the transcript of the first trial, he believed that the refusal to answer occurred as the officers were speaking with Applicant *at his house*. He concluded that Applicant "was not in custody at the time he made those statements and therefore it's admissible." Applicant's counsel replied that he had had "an agreement" with the first-trial prosecutor as to Applicant's custody status, and that the only reason the evidence of Applicant's station-house statement had come in at the first trial was that defense counsel had opened the door to it.[7] The new judge

---

[7] Applicant's trial counsel did not elaborate about the exact nature of his "agreement" with the prosecutor at the first trial, and the record of the first

announced that she agreed with the State that it boiled down to a question of whether Applicant was in custody at the time, and since she had not yet heard any testimony relevant to that question, she declined to rule on its admissibility. The prosecutor refrained on that basis from mentioning it during his opening statement.

Elliott testified at the second trial, however, contrary to the impression left by his testimony at the first trial, that the statement did *not* occur at the Applicant's house after all. Consulting the offense report, Elliott instead maintained that Applicant "did not say anything additional" to the officers once the shotgun had been produced, but that he did agree to accompany them to the police station. Elliott maintained that Applicant was not "under arrest" or "in custody" when taken "downtown," and that he was "free to leave at that time[.]" Without even mentioning whether Applicant had been Mirandized at the station, Elliott then began to testify about what Applicant told the officers there.

Before introducing the subject of Applicant's refusal to answer the one question at issue here, the prosecutor approached the bench pursuant to a motion in limine that he said had been granted pretrial.[8] Applicant's counsel objected that to introduce Applicant's refusal would violate his Fifth Amendment privilege to remain silent "whether he was in custody or not." The trial court did not explicitly rule on this objection

---

trial reveals no such explicit agreement. Understandably, the new trial court judged asked: "How can the two of you read the same transcript and accuse the other of being wrong [about] that[?]"

[8] We have found no such motion in limine, nor any other allusion to it, anywhere in the appellate record.

during the bench conference—at least not on the record.[9]

Still without any allusion to the Miranda warnings, the prosecutor commenced to lead Elliott through a narrative of the questions Applicant *did* answer at the station (as reflected in the offense report). Then she asked him:

> Q. Did you ask him, Sergeant Elliott, if the shotgun in question here would match the shells recovered at the scene of the murder?
>
> A. Yes.[10]

Applicant's counsel renewed his previous objection, which the trial court expressly overruled. The following colloquy ensued:

> Q. And what was his answer?
>
> A. He did not answer.
>
> * * *
>
> Q. Sergeant Elliott, what specifically did the defendant do after he remained silent when you asked him that question?
>
> A. Looked down at the floor, shuffled his feet, bit his bottom lip, clinched his hands in his lap, began to tighten up.

---

[9] Shortly after this bench conference, the trial court convened another bench conference which seems not to have been transcribed.

[10] We note, once again, that the offense report reflects that it was Allen, not Elliott, who actually asked Applicant the question. *See* note 6, *ante*. Elliott conceded on cross-examination at the second trial that, at least as a general proposition, the offense report was "likely to be more accurate" than his trial-time memory.

Q. Did you continue to ask him questions after this?

A. Yes.

Q. And did you talk to him -- did he answer any more questions?

A. Yes.

Q. He continued to answer questions?

A. Yes.

\* \* \*

Q. So, in this 58 minutes that you talked to [Applicant] on January the 28th of 1993, how many questions did he not answer?

A. One.

Applicant's trial counsel made no objection to this testimony *other than* that it violated Applicant's Fifth Amendment privilege to remain silent regardless of whether he was in custody at the time. Counsel made no attempt to elicit testimony from Elliott that Applicant had been Mirandized by the time he refused to answer, and neither did they attempt to invoke the protections of the Due Process Clause under *Doyle*. Nor did they argue that Applicant was in custody by that time, and object accordingly (as they appear to have done at the first trial) that his statement—including his refusal to answer the "one" question—was inadmissible because it was not electronically recorded, as required by Article 38.22, Section 3(a)(1).

The State then made more of a point of emphasizing Applicant's silence during its closing argument at the second trial than it had at the

first. The prosecutor argued:

> But then [the police] say [to Applicant, at the station]: All right. Let me ask you this. That shotgun that we just took, we checked the ballistics. Is it going to match up to the ballistics that we found at the murder scene? He's shocked. Probably the first time --

> [Defense Counsel]: Objection, Your Honor. That's outside the record.[11]

> THE COURT: Sustained.

> [Prosecutor]: The police officer testified he wouldn't answer that question. He didn't want to answer that. Probably the first time he realizes you can do that. What? You can compare those?  * * *  He didn't say: No, it's not going to match up. It's my shotgun. It's been in my house. What are you talking about? He wouldn't answer that question.

> But it's not like he just won't talk to [the police]. He is talking freely even before and after that question, but he does not answer that question and he had an hour span when he talked to [them].

Twice more during his final argument, the prosecutor alluded to Applicant's refusal to respond to this "one" question, albeit in passing while summarizing *all* of the evidence showing Applicant's guilt. This time the jury convicted Applicant after about five hours of deliberation. The jury also assessed his punishment at twenty years' confinement in the penitentiary and a $5,000 fine.

---

[11] Here, Applicant's counsel seems to have objected to the description of Applicant as "shocked"—for which there was indeed no direct evidentiary support—rather than the reference to Applicant's refusal to answer the question.

## D. The Appeal

Applicant appealed the issue that he *did* preserve at the second trial, namely, whether use of his refusal to answer the "one" question against him violated his Fifth Amendment right to silence regardless of whether he was in custody or had been Mirandized. The court of appeals rejected this claim. It first noted that "the United States Supreme Court has yet to decide what protections, if any, the Fifth Amendment affords to pre-arrest silence when the defendant does not testify and his silence is introduced by the State not for impeachment but in its case-in-chief." *Salinas*, 368 S.W.3d at 557. It also noted a split in authority over this question among both state courts and federal circuits. *Id.* at 557–58 & n.2. The court of appeals opted for those cases that have refused to recognize a Fifth Amendment application to non-custodial silence, on the ground that "only government compulsion triggers its protections against self-incrimination." *Id.* at 558. It held that "the Fifth Amendment has no applicability to pre-arrest, pre-*Miranda* silence used as substantive evidence in cases in which the defendant does not testify." *Id.*

On discretionary review, this Court affirmed the court of appeals' judgment and endorsed its reasoning. *See Salinas*, 369 S.W.3d at 179 ("In pre-arrest, pre-*Miranda* circumstances, a suspect's interaction with police officers is not compelled. Thus, the Fifth Amendment right against compulsory self-incrimination is 'simply irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak.'") (quoting *Jenkins v. Anderson*, 447 U.S. 231, 241 (1980) (Stevens, J., concurring))).

Given the national split in authority, the United States Supreme Court granted certiorari. *Salinas v. Texas*, 568 U.S. 1119 (2013). Having granted review to decide "whether the prosecution may use a defendant's assertion of the privilege against self-incrimination during a noncustodial police interview as part of its case in chief[,]" however, a plurality of the Supreme Court ultimately found it "unnecessary to reach that question." *Salinas v. Texas*, 570 U.S. 178, 183. Instead, the Supreme Court plurality held that a defendant under these noncustodial circumstances is at least "required to invoke" his Fifth Amendment privilege before he may rely upon it to insulate his silence from substantive use at trial. *Id.* at 191. And a suspect who is not in custody, has not been Mirandized,[12] "and who stands mute has not done enough to put police on notice that he is relying on his Fifth Amendment privilege." *Id.* at 188. At this juncture in its opinion, the Supreme Court plurality dropped a footnote to observe that "Petitioner is correct that *due process* prohibits prosecutors from pointing to the fact that a defendant was silent after he heard *Miranda* warnings," citing *Doyle*, 426 U.S. at 617–18, "but that rule does not apply where a suspect has not received the warnings' implicit promise that any silence will not be used against him[.]" *Salinas v. Texas*, 570 U.S. at 188, n.3. Of course, because the offense report indicates that Applicant *was* in fact Mirandized before refusing to answer the officers' question about what

---

[12] Because Elliott had not testified at Applicant's second trial (consistent with the offense report) whether Applicant had been Mirandized, the case arrived at the Supreme Court in the posture that his statement had occurred *before* he received his *Miranda* warnings. *See Salinas*, 570 U.S. at 181 (plurality opinion) ("Without being placed in custody or receiving *Miranda* warnings . . ."). *See* notes 11 & 12, *post.*

forensic evaluation of the shotgun would reveal, he now argues that his trial counsel were ineffective for failing to invoke the due process protection of *Doyle*.

### E. The Writ Application and Hearing

George Parnham and Dee McWilliams represented Applicant at both his first and second trials. The convicting court ordered each of them to submit an affidavit in response to Applicant's ineffective assistance of counsel claims. In their affidavits, both Parnham and McWilliams invoked the "confusion" generated by Elliott's vague and variable accounts from one trial to the next as to exactly when Applicant was in custody and at what point he was Mirandized. Both asserted that their approach to handling the issue of Applicant's refusal to answer had been a product of long-considered strategy. But neither could remember precisely what that strategy might have been—apart from taking what McWilliams called an "adamant position" that Applicant's right to silence was protected by the Fifth Amendment *regardless* of whether he was in custody.

Each also testified at an evidentiary hearing conducted over the course of two days, in April (McWilliams) and September (Parnham) of 2019. During his testimony, McWilliams acknowledged that he had had access to the offense report during Applicant's second trial. With respect to Applicant's claim that he should have raised *Doyle* error, he seems to have misremembered Elliott's testimony from the second trial, because he evinced a belief that Elliott had claimed that Applicant's statement and accompanying refusal to answer the one relevant question all

occurred *before* Applicant was Mirandized.[13] He acknowledged that the offense report showed otherwise, and he could not remember whether or why he did not also try to develop a *Doyle* claim, other than to explain that he "just didn't want to get . . . pigeonholed into the issue about whether he was in custody or whether it happened before or after the Miranda warnings." He believed that by insisting that the Fifth Amendment covered pre-custodial invocations of the right to silence, he could obviate these factual issues.

McWilliams said he was aware of *Doyle* at the time of Applicant's second trial, but he made the following pertinent observation about it:

Q. Specifically[,] Doyle v Ohio, what's your understanding of the Supreme Court's ruling in that case?

A. Well, I don't believe that after you've been mirandized if you choose to invoke your right to remain silent, then that would be protected.

I don't -- I think that when we talk about that, we're thinking of that in terms of someone gets mirandized and they say I'm not talking to you. I'm invoking my Fifth Amendment privilege or what -- however they handle it and don't say anything.

I think it's a -- was more of an open-ended question about what happens in the context of a person who actually waives their rights and executes and signs off on a consent form and gives a statement voluntarily. And then at certain points during the interview invokes their right to silence and whether they would have a right to -- whether they waived that or not.

---

[13] In fact, in his testimony at the second trial, Elliott simply did not relate one way or the other whether Applicant had been Mirandized at that point, focusing his remarks instead on whether Applicant was in *custody*. *See* note 12, *ante*; note 14, *post*.

From this, it seems to us that it was not at all clear to McWilliams that *Doyle* would even apply to the facts of Applicant's case even if he *had* been Mirandized prior to refusing to answer the pertinent question—if it was in the course of a statement following a *waiver* of those rights. In any event, given the ambiguity of the evidence with respect to when Applicant had been placed in custody and Mirandized, McWilliams acknowledged on cross-examination by the State that he had pursued "a broad strategy . . . to try and encompass any of those potential events[,]" so that "whether it is pre-custody, pre-Miranda or post-Miranda, it's inadmissible."

With respect to Applicant's complaint that he should also have challenged the admission of Applicant's entire statement under Article 38.22(3)(a)(1) (providing that oral and sign language statements must be recorded in some fashion), McWilliams admitted that if Applicant was in custody at the time police questioned him, "then [Article] 38.22 would apply to it." His memory of the second trial was that Elliott had testified that "most of the statement had all occurred prior to being [M]irandized."[14] Asked "what was the strategy for not objecting to that[,]" he answered:

> We talked about this a million times. And why we didn't want -- why we didn't pursue a motion to suppress on that, I do not recall. But we were -- in my mind there would have been some reason for it because this was such a focus on what we were doing. * * * I just don't recall what it was right now.

---

[14] As noted above, however, Elliott actually testified about Applicant's statement at the second trial without ever mentioning whether he had been Mirandized. *See* notes 12 & 13, *ante*.

He added that allowing at least parts of Applicant's statement to come into evidence had contributed to a strategy of showing (along with evidence showing that he had readily turned over the shotgun) that Applicant had cooperated with the police investigation: "I felt like it was a sign of his being cooperative and honest with the police." He could not remember whether he had tried to keep the statement out at the first trial.[15] When the State asked him again on cross-examination why he had not objected under Article 38.22 at the second trial, he repeated that he could not recall because "[i]t's just been too long and it was two trials."[16]

Parnham's memory was equally unavailing. Like McWilliams, he testified that they had received a copy of the offense report. He had "no independent recollection" why they had not filed a motion to suppress Applicant's oral statement, though he felt sure they had had "a purpose of which I do not recollect at this time." He did not know why

---

[15] Of course, the record of the first trial reveals that he *did* try to keep the statement out at the first trial, invoking Article 38.22, but then he was ruled to have opened to door to its admission anyway, however inadvertently.

[16] Despite the passage of time since Applicant's second trial, there is no laches issue in this case. The Supreme Court's opinion following Applicant's second trial came out in June of 2013, and Applicant filed his writ application in May of 2014, with an amended application in June of 2017. *See Ex parte Perez*, 398 S.W.3d 206, 216 & n.12 (Tex. Crim. App. 2013) ("[W]e recognize that delays of more than five years may generally be considered unreasonable in the absence of any justification for the delay. * * * [W]e do not foresee that the doctrine of laches will ordinarily apply to any application filed within five years after the exhaustion of direct appeals."). Even so, the imperfect memory of Applicant's trial counsel is not hard to understand after the passage of ten years. That being said, we do not ultimately predicate our denial of relief on Applicant's various claims of ineffective counsel to any extent on his trial counsels' failing memories.

McWilliams had not raised a *Doyle* objection.

### F. The Convicting Court's Recommendations

The parties prepared competing proposed findings of fact and conclusions of law, and they argued their respective positions to the convicting court on January 8, 2020. After hearing the arguments, the convicting court orally announced on the record that it found Applicant to have been in custody when the oral statement (including his refusal to answer the question about the forensic examination of the shotgun) was made, since Applicant signed a waiver form, a copy of which was admitted at the writ hearing, captioned "STATEMENT OF PERSON IN CUSTODY." On that basis, the convicting court orally announced that it was finding trial counsel ineffective for failing to object based upon Article 38.22. Without further elaboration, the convicting court then expressly adopted Applicant's *entire* proposed findings and conclusions, including a conclusion that trial counsel should have objected based on *Doyle*, as well as four other ineffective assistance of counsel claims.

In its *written* findings and conclusions, drafted by Applicant's habeas counsel, the convicting court found that Applicant's silence had occurred *after* he was in custody and *after* he was Mirandized, and it concluded that there was "no reasonable defense strategy" that would justify "counsels' failure to object to the admission of [Applicant's] custodial interrogation which included his silence." Many of the convicting court's findings of fact derive from the offense report. With respect to the chronology of events surrounding the statement, the convicting court found:

> The police report is clear: the police only asked [Applicant]
> about the shotgun comparison results after he was

transported to the police station, placed in an interview room, read his *Miranda* warnings twice, and presented with and asked to sign a "statement of person in custody" form.

Thus, the convicting court adopted Applicant's position that his oral statement occurred while he was in custody and post-*Miranda*.

Regarding Applicant's first trial, the convicting court found that McWilliams had reached an agreement with the first prosecutor that Applicant's statement was custodial, and that it had only been admitted when McWilliams opened the door; and that, otherwise, McWilliams had sought to exclude the statement in its entirety under Article 38.22. The convicting court found that, at the second trial, a different prosecutor attempted to change the evidentiary picture by suggesting that most of the oral statement (including Applicant's silence) had occurred at his home, not the police station. However, consistent with the police report, Elliott instead testified at the second trial that the questioning had occurred at the station—although he maintained that Applicant was not yet in custody at that time.[17]

The convicting court found that Applicant's trial counsel failed to

---

[17] Citing to the wrong page of the writ hearing, the convicting court also found that, "[a]t the second trial, there was no question that Sgt. Elliott's testimony was that the silence occurred post-*Miranda*." But this is inaccurate. It is arguable that McWilliams acknowledged during his testimony at the writ hearing that Elliott claimed during the second trial that Applicant did not give the oral statement until *after* he was Mirandized. But, as we have already noted, *see* notes 12, 13 & 14, *ante*, the record of the second trial refutes this. Elliott simply never said whether Applicant had been Mirandized *or not*, much less *when* he was Mirandized. Our rejection of this finding of fact has no bearing on our ultimate resolution of these claims.

ask for a hearing outside the jury's presence on the issue of custody, or to object to the statement on either *Doyle*–due process or Article 38.22 grounds; nor did they "use[] the offense report, the Statement of Person in Custody form, or prior testimony to prove that [Applicant] had been read his *Miranda* warnings and was in custody prior to remaining silent." Finally, the convicting court found that "the prosecution's more detailed and effective use of [Applicant's] silence was the main difference between the first trial, which ended in a mistrial, and the second trial, which resulted in a finding of guilt."[18] It concluded that, "had the defense objected on [d]ue [p]rocess or [A]rticle 38.22 grounds, [Applicant's] silence would not have been admissible at his [second] trial." And "in light of the police report, it was unreasonable not to argue that the silence was inadmissible pursuant to the Due Process Clause and [A]rticle 38.22." In short, the convicting court concluded, "no reasonable trial strategy" was offered to excuse the failure to raise objections to (1) the admission of Applicant's silence, under *Doyle*, or (2) to admission of the *entire* oral statement, under Article 38.22.

Although this Court is the "ultimate" factfinder in post-conviction habeas corpus proceedings under Article 11.07, "in most circumstances, we will defer to and accept a trial judge's findings of fact and conclusions

---

[18] The writ hearing judge (different from the trial court judge at both the first and second trials) characterized the prosecutor's allusion to Applicant's silence during the State's summation at the *first* trial as having been made "briefly" and "in passing." We would not have characterized the prosecutor's use of that silence at the first trial as "brief" and "in passing" as the convicting court recommends. But given our ultimate disposition of Applicant's claims, our disagreement with the writ hearing judge on this fact question is ultimately immaterial.

of law when they are supported by the record." *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008). When recommended findings and conclusions are not supported by the record, however, "we may exercise our authority to make contrary or alternative findings and conclusions." *Id.* In this case, even accepting the convicting court's recommended findings of fact as (for the most part) supported by the record,[19] we conclude that the *law* does not ultimately support granting relief based upon those facts, and we will therefore deny relief.

## II. THE STANDARD OF REVIEW: *STRICKLAND*

The burden is on Applicant to establish ineffective assistance of his trial counsel by a preponderance of the evidence. *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011). Such a claim has two components: (1) deficient performance, and (2) prejudice. *Strickland*, 466 U.S. at 687. Counsel performs deficiently if he has "made errors so serious" that it cannot be said he functioned as the "counsel" guaranteed by the Sixth Amendment. *Id.* It is presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. There are countless ways to provide effective assistance in any given case, and counsels' performance must be evaluated "as of the time of [their] conduct[,]" not through "the distorting effects of hindsight." *Id.* at 689–90.

Finally, and most critically to this case, we do not ordinarily declare counsel to have performed deficiently for failing to invoke unsettled legal principles. *See, e.g.*, *Ex parte Bahena*, 195 S.W.3d 704, 707 (Tex. Crim. App. 2006) (counsel was not ineffective for failing to act

---

[19] *But see* notes 17 & 18, *ante*.

on the basis of "law that was unsettled at the time and is unsettled to this day"); *Ex parte Chandler*, 182 S.W.3d 350, 358 (Tex. Crim. App. 2005) (trial counsel will not be liable for an error in judgment on an unsettled proposition of law); *Ex parte Welch*, 981 S.W.2d 183, 184 (Tex. Crim. App. 1998) ("[W]e will not find counsel ineffective where the claimed error is based upon unsettled law."). To base an ineffective assistance of counsel claim on law that is unsettled as of the time of the attorney's performance would indulge in the kind of retrospective evaluation that *Strickland* forbids. *Vaughn v. State*, 931 S.W.2d 564, 567 (Tex. Crim. App. 1996)(citing *Strickland*, 466 U.S. at 690).

If counsels' performance was indeed deficient, even under this fairly forgiving standard, their deficient performance is prejudicial only if those errors were so serious as to deprive the defendant of a fair trial, that is, a trial whose result is reliable. *Strickland*, 466 U.S. at 687. Applicant must show that, but for counsels' deficient performance, there is a reasonable probability that the result of his trial would have been different, a reasonable probability being one sufficient to undermine confidence in the outcome. *Id*. at 694.

Both showings (deficient performance and prejudice) are required, and the failure to make a showing as to either component will obviate a reviewing court's need to address the other. *Id*. at 697. Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id*.

In this case, we conclude that, for the following reasons, trial counsel did not perform deficiently in failing to challenge the admissibility of Applicant's silence under either *Doyle* or Article 38.22.

(*See* Parts III & IV, *post*.) Applying those legal principles to the facts of Applicant's case as developed in these post-conviction proceedings, it is not at all clear that Applicant could have prevailed—any more than he was ultimately able to prevail on the Fifth Amendment right-to-silence claim that he actually made and pursued all the way to the United States Supreme Court. Having determined that counsel did not perform deficiently in those respects, we also conclude that none of the remaining allegations of deficient performance, even when cumulated, shake our confidence in the outcome; that is, they do not raise a reasonable probability that, had counsel not committed those (presumably) serious errors, the result would have been different. (*See* Part V, *post*.)

## III.  *DOYLE* ERROR

In *Doyle*, the Supreme Court held that a state may not induce a defendant to stand mute in the face of police questioning by cautioning him of his right to silence and then use his invocation of that right against him to impeach his trial testimony. *Doyle*, 426 U.S. at 618; *see also Fletcher v. Weir*, 455 U.S. 603, 606 (1982) ("[W]e have consistently explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him."); *c.f.*, *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980) (holding that silence *before* arrest and *absent Miranda* warnings could be used for impeachment purposes, notwithstanding *Doyle*). "In such circumstances," the Supreme Court explained, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle*, 426 U.S. at 618. Nor, the Court

subsequently held, may a state put such evidence to substantive use by admitting a defendant's *Miranda*-induced silence against him as evidence to refute his claim of insanity. *See Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986) ("What is impermissible is the evidentiary use [including to prove sanity] of an individual's exercise of his constitutional rights after the State's assurance that the invocation of those rights will not be penalized.").

The difference between the facts of *Doyle* and the facts of this case, as trial-counsel McWilliams surmised, is that Doyle actually *did invoke* his right to silence after he was Mirandized, by essentially remaining wholly silent after the warnings were administered.[20] Applicant, by contrast, affirmatively acknowledged and *waived* his right to silence and commenced to answer questions before being confronted with the "shotgun comparison" inquiry. Thus, the facts of this case raise an issue of whether a suspect in Applicant's shoes, choosing silence only *selectively* after having seemingly waived that constitutional right, may still invoke the due process protections of *Doyle*. The so-called "selective silence" cases have engendered disagreement among the various jurisdictions that have addressed the issue. *See Friend v. State*, 473 S.W.3d 470, 480 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (cataloging some of those conflicting cases while avoiding the issue because Friend had actually spoken, and it was his words in actually

---

[20] Doyle simply asked his interrogators, "What's this all about?" He did not otherwise respond to their questions. *Doyle*, 426 U.S. at 614 n.5. *See Anderson v. Charles*, 447 U.S. 404, 407 (1980) (describing *Doyle* as involving "two defendants who made no post[-]arrest statements about their involvement in the crime"). Doyle certainly did not *expressly* waive his right to silence, as Applicant here did.

*invoking* his right to silence that were used against him). Neither the United States Supreme Court nor this Court has yet tackled the issue.

In *Anderson v. Charles*, 447 U.S. 404 (1980), the defendant was Mirandized and then chose to speak to the police. His statement was then used to impeach his trial testimony. The Supreme Court explained:

> *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.

*Id.* at 408.

But suppose a Mirandized defendant at first chooses to speak to the police, in apparent derogation of his right to silence, but then refuses to answer certain select questions, whether or not on the express ground that his answers might incriminate him? Has such a defendant been unfairly induced by *Miranda* warnings he has effectively waived into remaining silent on the promise that his silence will not be used against him? This question had not been definitively decided as of the time of Applicant's second trial—nor indeed to this day.

The cases and commentators go both ways. Many if not most state courts to have addressed the question have held that a defendant who has waived his *Miranda* rights may *not* selectively decline to answer particular questions and still resort to the protection of *Doyle*—at least absent an express or apparent re-invocation of his right to silence. *E.g.,* *Valle v. State*, 474 So.2d 796, 801 (Fla. 1985) (a defendant who "freely and voluntarily conversed with police" after receiving *Miranda*

warnings could not invoke *Doyle*); *Thomas v. State*, 726 So.2d 357, 358 (Fla. Dist. Ct. App. 1999) (following *Valle*); *State v. Talton*, 197 Conn. 280, 295, 497 A.2d 35, 44 (1985) (refusing to apply *Doyle* when the defendant started out talking but "selectively" refused to answer one question, because "[o]nce an arrestee has waived his right to remain silent, the *Doyle* rationale is not operative because the arrestee has not remained silent"); *State v. Torres*, 85 Conn. App. 303, 316, 858 A.2d 776, 785 (2004) (following *Talton*); *State v. Smart*, 756 S.W.2d 578, 580–81 (Mo. Ct. App. 1988) (a defendant who waived her *Miranda* rights but then refused to answer some questions may not rely on *Doyle*, and the option to re-invoke the right to silence "is not available to avoid a single offensive question, but to cease all questioning, and the suspect is under an obligation to communicate his decision in an intelligible fashion"); *People v. McReavy*, 436 Mich. 197, 222, 462 N.W.2d 1, 12 (1990) (a defendant who waived his *Miranda* rights may not thereafter selectively refuse to answer questions and still invoke *Doyle*'s rationale); *People v. Bowman*, 202 Cal.App.4th 353, 365, 136 Cal.Rptr.3d 119, 127 (2011) ("We are persuaded in this case that the *Doyle* rule did not prohibit the prosecution's use of Bowman's selective silence as adoptive admissions.").

But a few states have held—albeit uncritically—that a waiver of *Miranda* rights followed by "selective silence" will not prevent a defendant from successfully invoking *Doyle*'s due process protections. *See Coleman v. State*, 434 Md. 320, 338, 75 A.3d 916, 926 (2013) (holding trial counsel ineffective for failing to raise *Doyle* error where, after receiving *Miranda* warnings, the defendant answered some questions

but not others—but holding so without reference to the "selective silence" line of cases); *Bartley v. Commonwealth*, 445 S.W.3d 1, 9–10 (Ky. 2014) (concluding that evidence of the defendant's silence was inadmissible under *Doyle* when she expressly invoked her right to silence when Mirandized but then answered some questions posed by police interrogators on *another* matter while persistently refusing to answer questions on the topic about which she had expressed her desire to remain silent).

The federal circuits have also gone both ways. *Compare United States v. Goldman*, 563 F.2d 501, 503 (1st Cir. 1977) (a defendant who waives his *Miranda* rights and tells investigators an exculpatory story cannot refuse to answer certain questions and expect his silence to be insulated: he "cannot have it both ways"); *United States v. Pitre*, 960 F.2d 1112, 1125–26 (2nd Cir. 1992) (referencing *Doyle*, but holding that a defendant who waived *Miranda* rights and made statements could not thereafter refuse to answer some questions without re-invoking his right to silence); *United States v. Burns*, 276 F.3d 439, 441–42 (8th Cir. 2002) (after waiver of *Miranda* rights, the defendant could not simply refuse to answer certain questions and then rely on *Doyle*'s protection, absent a clear re-invocation of his right to silence); *McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 104–05 (3rd Cir. 2012) (noting the split in the federal circuits regarding application of *Doyle* to "selective silence," and holding that there is no "clearly established Federal law" on the issue for purposes of the Antiterrorism and Effective Death Penalty Act (AEDPA)), *with United States v. Williams*, 665 F.2d 107, 109–10 (6th Cir. 1981) (applying *Doyle* to find "plain error" in a "selective silence"

scenario, but without any discussion of the fact that the defendant had expressed a "willingness to talk" after receiving *Miranda* warnings and then "answered some questions"); *United States v. Canterbury*, 985 F.2d 483, 486 (10th Cir. 1993) ("This court has recognized that when a defendant [who has received *Miranda* warnings] answers some questions and refuses to answer others, or in other words is 'partially silent,' this partial silence does not preclude him from claiming a violation of his due process rights under *Doyle*."); *United States v. Scott*, 47 F.3d 904, 907 (7th Cir. 1995) ("[A] suspect may speak to the agents, reassert his right to remain silent or refuse to answer certain questions, and still be confident that *Doyle* will prevent the prosecution from using his silence against him.").

Perhaps the most comprehensive discussion of "selective silence" in a case that applied *Doyle* to *grant* relief is the Ninth Circuit opinion in *Hurd v. Terhune*, 619 F.3d 1080 (2010)—another AEDPA opinion that issued more than a year *after* Applicant's second trial. After he was Mirandized, Hurd expressed a willingness to speak with investigators, but during the interview he repeatedly refused to "reenact" the offense or submit to a polygraph. The Ninth Circuit disagreed that an apparent waiver of *Miranda* rights meant that a defendant could not thereafter rely upon *Miranda*'s implicit promise that silence could not be used against him without his first at least re-invoking that right. *Id.* at 1088. "That silence may not require police to end their interrogation," the court observed, "but it also does not allow prosecutors to use silence as affirmative evidence of guilt at trial." *Id.* The court concluded that the state court judgment to the contrary was not simply incorrect, but an

unreasonable application of the applicable federal law. *Id*. This conclusion was not subjected to certiorari review, however, in the United States Supreme Court. As one commentator has since observed:

> Ultimately, the Hurd case demonstrates the extensive split between the circuit courts on the rights of a suspect regarding his choice to answer questions or not during Post-Miranda custodial interrogation. * * * With such a wide divergence among the circuit courts, the Supreme Court now has the responsibility to reconcile this unsettled doctrine.

Evelyn A. French, Note, *When Silence Ought to be Golden: Why the Supreme Court Should Uphold the Selective Silence Doctrine in the Wake of* Salinas v. Texas, 48 GA. L. REV. 623, 645 (Winter 2014).

Had Applicant's trial counsel invoked *Doyle* on the facts of this case, they would have been no more assured of success in keeping out the evidence of Applicant's refusal to answer the "shotgun comparison" question than they could have been of obtaining relief on the Fifth Amendment-based objection that they actually did make at trial.[21] Even if *Hurd* represents a trend in Applicant's favor, the law remains ultimately unsettled. Under these circumstances, we cannot declare that counsel's failure in 2009 to invoke *Doyle* was so professionally derelict as to fall outside "the wide range of reasonable professional assistance[.]" *Strickland*, 466 U.S. at 689. We cannot conclude that

---

[21] McWilliams's testimony at the writ hearing, as quoted above, *ante* at 20, suggests that, notwithstanding his difficulty remembering how he had formulated his strategy for dealing with Applicant's silence, he may have had some notion prior to Applicant's second trial that the law was unsettled with respect to "selective silence" scenarios such as Applicant's.

Applicant's trial counsel performed deficiently in this respect. We turn next to Applicant's Article 38.22-based claim.

## IV. ARTICLE 38.22 ERROR

At least judging by his oral statement at the writ hearing, the convicting court judge seemed most convinced that Applicant's trial counsel performed deficiently in failing to re-assert an Article 38.22, Section 3, objection to Applicant's entire oral statement—*including* his refusal to answer the "one" question—at the second trial. And this does in fact seem to be a closer question. Counsel could have sought a pretrial hearing at which to develop a record outside the presence of the jury in order to more precisely ascertain whether Wendel and Elliott (and perhaps Allen) would in fact adhere to the chronology of events memorialized in their offense report.[22] There was a substantial argument to be made that Applicant's statement was, in its entirety, objectionable under the statute as an unrecorded custodial statement.

Nevertheless, it is far from clear that this argument would have prevailed had Applicant's trial counsel asserted it—at least not as it pertained to Applicant's *silence*. This Court has yet to speak to the

---

[22] In his affidavit in response to Applicant's writ application, McWilliams indicated that, due to the passage of time and "despite considerable reflection on the matter," he "simply cannot remember why we chose not to file a motion to suppress on this issue, nor did [he] request a *Jackson v. Denno* hearing outside the presence of the jury." *Jackson v. Denno*, 373 U.S. 368 (1964), of course, held that due process requires a factfinder that is independent of the jury which determines guilt or innocence to ascertain whether police interrogators extracted an involuntary confession from the accused. We see no reason Applicant should not likewise have been entitled to a different factfinder to determine, outside the presence of the jury hearing evidence as to his guilt or innocence, whether his statement to the police was admissible as a matter of state law, had he requested that.

question of whether the *refusal* to answer a question during a police interrogation that is not electronically recorded actually counts as part of the "oral statement" that Article 38.22, Section 3, contemplates. At least one court of appeals—the Amarillo Court of Appeals—has held that it does *not*, and its opinion was published a decade before Applicant's second trial. *See Beck v. State*, 976 S.W.2d 265, 267 (Tex. App.—Amarillo 1998, pet. ref'd) ("[T]he officer's description of what appellant *did not say* was not a statement as contemplated under article 38.22, section 3 of the Texas Code of Criminal Procedure. So, trial counsel was not obligated to object to those comments on the basis of article 38.22, section 3."). Nothing in the record shows that Applicant's trial counsel was unaware of this intermediate-court authority. Counsel also testified at the writ hearing that he thought it actually benefited Applicant to admit at least part of the statement.

It was Applicant's burden to establish by a preponderance of the evidence that his counsel were ineffective. But these facts suggest at least the possibility that counsels' failure to object to the statement on the ground of Article 38.22, Section 3, represented a sound trial strategy. Applicant has not ruled out this possibility.

On the other hand, the Texarkana Court of Appeals seems to have held, prior to Applicant's second trial, that the refusal to answer certain questions during unrecorded police questioning *does* count as part of an oral statement covered by Article 38.22, Section 3. *Pina v. State*, 38 S.W.3d 730, 735 (Tex. App.—Texarkana 2001, pet. ref'd). That court of appeals believed this to be the case because it treated the refusal to answer certain questions as "nonverbal conduct intended as an

assertion," thus fitting the definition of "statement" in Black's Law Dictionary. *Id*. (citing BLACK'S LAW DICTIONARY 1416 (7th ed. 1999)).

But, of course, if the Texarkana court is correct that such silence counts as an "assertion of fact," then Applicant's refusal to answer the "shotgun comparison" question may well have also become admissible under Article 38.22, *Section 3(c)*. Section 3(c) provides that Section 3(a)'s exclusion from evidence of a non-recorded oral statement "shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and conduce to establish the guilt of the accused, such as the finding of . . . the instrument with which he states the offense was committed." TEX. CODE CRIM. PROC. article 38.22(3)(c). Applicant's trial counsel may have believed the trial court would regard Applicant's silence as an assertion that the shotgun comparison would reap a result unfavorable to him, which forensic testing the next day actually confirmed. In that case, he might reasonably have expected for the State to argue, and the trial court to conclude, that Applicant's silence was admissible under Article 38.22, Section 3(c), and that on that basis the trial court would overrule any objection under Article 38.22, Section (3)(a).

This Court refused discretionary review in both *Beck* and *Pina*, thus leaving the question whether silence should be regarded as part of an "oral statement" for purposes of Article 38.22, Section 3(a), in an unsettled state. That was the state of the law at the time of Applicant's second trial in 2009, and it remains the state of the law to this day. Under these circumstances, we cannot fault Applicant's trial counsel for opting to make an all-encompassing objection based on Applicant's

constitutional right to silence. That this strategy did not ultimately prevail does not render trial counsels' performance constitutionally deficient. *See Martin v. State*, 623 S.W.2d 391, 395 (Tex. Crim. App. 1981) ("Ineffectiveness is not shown when the tactic is unsuccessful.").

## V. MISCELLANEOUS CLAIMS OF INEFFECTIVENESS

Applicant raised four other claims of ineffectiveness of counsel. The convicting court concluded that trial counsel performed deficiently with respect to each of these claims as well, and concluded that each instance of deficient performance, by itself, was sufficient to undermine confidence in the outcome of Applicant's second trial. It also concluded that, "even if no single error gave rise to ineffective assistance, the cumulative effect of defense counsel's deficiency gave rise to prejudice." Having concluded that trial counsel did not perform deficiently with respect to Applicant's first two claims, we do not, of course, include those claims within any "cumulative" prejudice we might find. And even assuming that trial counsel performed deficiently in every other respect that the convicting court recommends we find, we do not believe even the cumulative effect of those four claims rises to the level of *Strickland*'s outcome-determinative prejudice standard. Thus, we reject Applicant's other claims under *Strickland*'s prejudice prong.

### A. The Claims

**Ground Three:** At the conclusion of Applicant's police interrogation, Sergeant Elliott was asked why he had taken Applicant into custody. Elliott responded, without any objection by the defense, that "I had the opinion that he was deceptive and lying to me and I wanted to hold him." Applicant now claims that trial counsel should

have objected that Elliott's testimony constituted objectionable expert opinion evidence as to his credibility. The convicting court recommends that we sustain this claim on the basis of cases involving the inadmissibility of expert testimony with respect to the truthfulness of a *witness*,[23] without explaining the applicability of those cases to a police officer's explanation of why his investigation took a particular turn.

**Ground Four:** Applicant argues that trial counsel was deficient in failing to present readily available alibi testimony showing that Applicant was at home with his girlfriend at the time the Garza brothers were shot. This testimony, he contends, was available from both his girlfriend and Applicant's sister. Trial counsel McWilliams testified at the writ hearing that trial counsel had not deemed this evidence credible (and they even worried somewhat about the risk of suborning perjury).

**Ground Five:** Applicant argues his trial counsel should have objected to testimony that Applicant was using crack cocaine "in that time period" surrounding the murders. He contends that this was bad-act evidence that was inadmissible. The State had not included this extraneous misconduct in its notice to the defense under Rule 404(b) of the Rules of Evidence. TEX. R. EVID. 404(b). Nor did trial counsel seek a limiting instruction to corral the jury's consideration of this evidence once it was admitted. Trial counsel explained in their affidavits, and at

---

[23] Applicant did not take the stand to testify at either his first or second trial, so his truthfulness as a witness was never an issue. Trial counsel McWilliams testified at the writ hearing that he had made a tactical decision to point out in cross-examination that Elliott had never previously said anything about Applicant's deceptiveness, either in the offense report or the first trial.

the writ hearing, that evidence of Applicant's use of crack cocaine during that period was not incompatible with their defensive strategy,[24] and that the failure to request a limiting instruction had been a tactical decision.

**Ground Six:** Applicant also contends that trial counsel should have impeached several important State's witnesses. First, he argues, they should have impeached Martha Trevino's (more about her later) testimony, which did not wholly conform with the statement she had given to the police.[25] Second, he argues, they should have impeached Damien Cuellar's testimony that Applicant was using crack cocaine around the time of the murders and could become paranoid when using crack. Evidently, Cuellar had never made such assertions before, either in his statements to the police or in his first-trial testimony. Applicant suggests that impeachment of Cuellar could have provided a potential explanation for an otherwise apparently motiveless crime. Third, he argues that trial counsel failed to impeach Officer Elliott with testimony from Applicant's first trial that Applicant had in fact *not* been free to

---

[24] McWilliams testified at the writ hearing that ""[i]t fit with our narrative that there were drugs and drug usage and potentially drug sales out of the Garza house." Admitting that he had tried to keep the evidence out at the first trial, McWilliams explained that there had been "an evolution of the defensive strategy" and that "we did make some adjustments to that."

[25] Trevino all but admitted to the contradiction at trial, admitting that she "guessed" she had made the contradictory statement to the police. McWilliams maintained at the writ hearing that "it was obvious what my point was about and so I just elected to move on from it." He thought that "the jury already understood that that's what -- that's what she had said previously based on my questions." He did not want the jury thinking he was "making a mountain out of a molehill about this thing and they got the point."

leave once he arrived at the police station.[26]

### B.  The Bigger Evidentiary Picture

We do not believe there is a reasonable probability that, even collectively, these alleged deficiencies—even if indeed they were deficiencies—could have affected the outcome of the trial. Factoring Applicant's failure to answer the "shotgun comparison" question into the equation, the inculpatory evidence in this case, though circumstantial, was nearly overwhelming. The failure of trial counsel to keep out Elliott's opinion testimony respecting Applicant's credibility, to present apparently questionable alibi testimony, to object to or corral the admissibility of extraneous misconduct testimony, or to impeach certain witnesses with relatively minor discrepancies would not likely have impacted the jury's verdict of guilty, given the evidence marshaled against Applicant.

Martha Trevino was another resident of Hector Garza's small apartment complex, and after hearing the shotgun blasts, she observed the apparent shooter from her apartment window as he ran from the premises and got into the passenger side of a black or dark-colored Trans Am or Camaro. She did not see the shooter's face, so it is not a surprise that she could not later identify Applicant in a line-up. But a few days after the shooting, Applicant confessed to Cuellar, who was a mutual

---

[26] Applicant also claims that trial counsel should have impeached Elliott's testimony that he was a participant in Applicant's interrogation. He maintains that the offense report indicated that Elliott was *not* present, if only by failing to note his presence. *See* notes 6 & 10, *ante*. But Elliott has consistently testified that he *was* present, even if the offense report does not *explicitly* place him there, and trial counsel testified at the writ hearing that Applicant never told him that Elliott had *not* been in the interrogation room. The offense report does not positively *refute* Elliott's claim.

friend of both Applicant and the Garza brothers, that Applicant had been the one to kill them. Cuellar claimed that Applicant had told him that "either they're going to get me or I have to get them[.]" Cuellar did not admit to the police right away that Applicant had confessed to him, waiting until the third time he spoke to them, and certain aspects of what he claims Applicant told him about how the shooting occurred do not comport with the crime scene and other witness testimony. Nor did his description of the shotgun he knew Applicant owned jibe with the shotgun that police recovered from Applicant's home, which later proved to be the murder weapon. Moreover, Cuellar was apparently an idiosyncratic witness, telling police that he finally decided to tell them about Applicant's confession only after the Garza brothers appeared to him in a dream.[27]

Nevertheless, according to firearms examiner Kim Downs of the Houston Police Department Crime Lab, when the police did retrieve the shotgun from Applicant's home, forensic testing showed that each of the six shells recovered from the murder scene "were fired" from that shotgun "to a reasonable certainty"—indeed, she confirmed that the spent shells were a "unique match to that gun." Meanwhile, Applicant refused to answer the "one" question during his oral statement that would have indicated what he believed that forensic testing would later reveal. And, when the police alerted Applicant the next day to the fact that the forensic testing demonstrated the shotgun was in fact the

---

[27] During his summation at the guilt stage of the second trial, even while arguing Cuellar's reliability as a witness, the prosecutor acknowledged that "he's a goofy guy. Kind of weird, but he was forthright."

murder weapon, he absconded and was not arrested for fifteen years, all while living under an alias, thereby manifesting perhaps an even greater consciousness of guilt than his failure to answer the "one" shotgun comparison question during interrogation.

The defensive strategy was to impugn the police investigation and to suggest that Hector Garza had fallen into disfavor with a local crack dealer who drove a dark-colored Trans Am, which suggested an alternative suspect who might have had a motive to kill the Garzas. But this defensive theory could not explain how the murder weapon came to be found in Applicant's home. The defense made a concerted effort to call the reliability of the State's forensic evidence into question, by cross-examination of the testifying firearms examiner, and by calling a defense expert who called the methodology of the State's expert into question in some respects. But that effort seems to have been largely ineffectual, even on a cold record.[28] Applicant's trial counsel made only glancing reference to it at the very end of their final guilt-phase argument.

## C. Prejudice?

None of the ways in which Applicant alleges that his counsel performed deficiently in his last four claims would have made a serious

---

[28] In fact, Kim Downs, the firearms examiner who testified at both of Applicant's trials, was not the same firearms examiner who had conducted the original examination in 1993. However, she had independently re-tested the evidence prior to Applicant's first trial and confirmed the original firearms examiner's conclusion that the shotgun recovered from the home at which Applicant was living with his parents and sister was "a match" to the shotgun that fired the spent shell casings recovered at the murder scene. Moreover, at Applicant's second trial, the State also produced the original firearms examiner, now retired, who also confirmed his original findings.

dent in the State's evidence.

**First--Elliott's Testimony:** It would already have been apparent to the jury that the police had detained Applicant after his interrogation because the officers did not believe his denials. Preventing Elliott from expressly *saying* so at trial could not have affected the jury's deliberations in any substantive way.

**Second--Alibi Testimony:** To present alibi testimony from obviously interested witnesses could not have significantly undermined the State's compelling evidence that the forensically determined murder weapon was in fact *recovered from Applicant.*

**Third--Extraneous Misconduct:** The evidence already showed that Applicant had been indulging in crack cocaine at the Garzas' apartment the night before the murders. That Applicant was more *generally* indulging in that habit "in that time period" can only have incrementally impacted the jury's deliberations, and it was not even wholly incompatible with Applicant's defensive posture that the Garzas were actually victims of the broader drug culture rather than of Applicant's crack-induced paranoia.

**Fourth--Failure to Impeach:** Applicant would have had trial counsel impeach Martha Trevino because she refused during her second-trial testimony to fully acknowledge a statement that she had made to police suggesting that the Garzas might be dealing drugs from Hector's apartment. This could only have very slightly bolstered Applicant's defensive suggestion that the Garzas were the victims of a dispute over drugs or drug money. Likewise, pointing out that Cuellar had not previously made assertions about Applicant's drug use and attendant

paranoia would not have constituted particularly compelling impeachment evidence; at least not in the same way that a prior inconsistent statement would have. And finally, failure to impeach Elliott's testimony with respect to Applicant's custodial status could not have affected any material issue with respect to Applicant's *guilt or innocence*; it was relevant only to the admissibility of his oral statement, an issue that was not up to the jury to decide. Even collectively, there is no reasonable probability that these purported deficiencies of counsel were outcome-determinative.

## VI. CONCLUSION

We conclude that Applicant's first two claims do not demonstrate deficient performance under *Strickland*, and that his remaining four claims do not satisfy *Strickland*'s prejudice prong because there is no reasonable probability that they would have altered the outcome of Applicant's trial. Accordingly, we deny relief.

**DELIVERED:**                                   November 16, 2022
**PUBLISH**